Michael GAYDEN, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 02A03–0604–CR–178.

Court of Appeals of Indiana.

April 5, 2007.

David L. Joley, Fort Wayne, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Michael Gayden appeals his convictions for possession of a firearm by a convicted domestic batterer as a class A misdemeanor and criminal mischief as a class B misdemeanor. We affirm.

### Issues

We restate Gayden's issues as follows:

I. Whether the trial court abused its discretion by admitting a 911 recording; and

II. Whether the evidence was sufficient to sustain his conviction.

### Facts and Procedural History

On October 15, 2004, Makia Jones, Gayden's former girlfriend, called him and discovered that there was a woman named Toya at his house who "did not like" Jones's roommate, Lashay Epperson. Tr. at 97. Jones and Epperson drove to Gayden's house, and Epperson and Toya began to fight in the yard. Several other people were on the lawn as well. Gayden fired a handgun into the air, and everyone ran. Then, as Epperson was getting into her car, Gayden broke her windshield with the butt of the gun. Epperson drove away with Jones as her passenger. Epperson called 911 when she had driven approximately one-half mile away from Gayden's house. During the 911 call, Epperson identified Gayden as the shooter and as the person who broke her windshield. She described what he was wearing. She told the operator that she saw someone carrying a gun and running down the alley near Gayden's house. She speculated about where he might have hidden the gun, and she told the operator that police would find shell casings in Gayden's yard. In the background of the recording, one can hear Jones assisting Epperson in providing information to the operator, such as the spelling of Gayden's last name and his exact address. The call lasted approximately five minutes.

Police arrived at Gayden's house and found a gathering of people inside the house and in the yard. Police instructed Epperson and Jones to return to the scene, which they did, and Officer Donald Lewis talked with them about the incident. Officer Lewis testified that when he questioned the women, Jones told him that Gayden became upset with her and Epperson, retrieved a gun from someone else's clothing, and fired two rounds in the air. She stated that Gayden then approached Epperson's car yelling and screaming and pounded the butt and the barrel of the gun on Epperson's windshield. She noted that Gayden was wearing a white t-shirt. She also told Officer Lewis that she saw a black male in a white t-shirt running down

the alley toward the rear of Gayden's house.[1]

Officer Lewis and other police officers investigated the area surrounding Gayden's house. He noted that the damage to Epperson's windshield was consistent with Jones's description of the windshield having been beaten with a gun barrel. He found a .45 caliber round on one of the windshield wipers. Officers found a .45 caliber semi-automatic handgun in an abandoned garage across the alley behind Gayden's house. On the barrel of the gun was white powder that looked like crushed glass residue. There were small scrapes and scratches around the muzzle of the barrel, also consistent with contact with broken glass. Police discovered two .45–caliber shell casings and a live round in Gayden's yard. When police took Gayden into custody, he looked at Epperson and Jones and said, "I'm gonna get out sometime bitch." *Id.* at 158.

Epperson did not testify at trial. Over Gayden's objection, the 911 call in which Epperson identified Gayden as the perpetrator was admitted into evidence and played for the jury. Jones testified that she did not recall identifying Gayden when she talked with Officer Lewis on the night of the incident. In fact, she stated that Gayden could not have fired the gun because he was inside his house at the time of the shooting. She also testified that she did not see who broke Epperson's windshield and that she saw two boys wearing white t-shirts running down the alley near Gayden's house with a gun. She stated that she thought Gayden was wearing a black shirt that night. Jones was the only eyewitness who testified at trial.

Gayden was found guilty as charged. He now appeals.

### Discussion and Decision

#### I. Admission of 911 Recording

■ Gayden claims that the trial court erred by admitting the recording of Epperson's 911 call. The decision to admit or exclude evidence falls within the sound discretion of the trial court, and we review that decision only for abuse of discretion. *N.W. v. State*, 834 N.E.2d 159, 161 (Ind.Ct. App.2005), *trans. denied.* An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

■ Gayden alleges that the trial court's admission of the 911 recording violated his Sixth Amendment right to confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).[2] The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford*, the United States Supreme Court reviewed the historical background of the confrontation clause in order to determine the framers' intent as to the breadth of its application, and specifically, whether it applied to the defendant's wife's out-of-court statement to police. The wife had made the statement at issue while she was in police custody as a potential suspect, in response to "often leading questions" from detectives. *Id.* at 65, 124 S.Ct. 1354. The Court made two conclusions about the meaning of the Sixth Amendment:

---

1. Gayden is African–American.

2. Gayden also claims that the admission of the 911 recording violated his rights under Article 1, Section 13 of the Indiana Constitution. Because Richardson fails to cite any authority or make any separate argument specific to the state constitutional provision, he waives this argument on appeal. *See Richardson v. State*, 800 N.E.2d 639, 647 (Ind.Ct. App.2003), *trans. denied* (2004).

First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused....

. . . .

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." *1 N. Webster, An American Dictionary of the English Language* (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

. . . .

The historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the "right ... to be confronted with the witnesses against him," ... is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.... [T]he common law in 1791

conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations.

*Crawford,* 541 U.S. at 50–54, 124 S.Ct. 1354 (some citations omitted).

In *Crawford,* the Supreme Court held that "testimonial" applied "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354. Because this conclusion was sufficient to determine the Court's decision in that case, it chose not to spell out a comprehensive definition of "testimonial." Recently, however, the Court provided further guidance on what types of statements might be considered testimonial, including those made during 911 calls. *See Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).[3]

In *Davis,* Michelle McCottry made a 911 call as her former boyfriend assaulted her in her home. She told the operator that "[h]e's here jumpin' on me again" and "[h]e's usin' his fists." *Id.* at 2271. The operator asked for the assailant's first and last name, and McCottry responded that his name was Adrian Davis. She then told the operator that he was fleeing the scene in someone else's car. After Davis was gone and before officers arrived on the scene, the operator questioned McCottry about Davis and learned such things as the events that led to the assault and Davis's date of birth.

The Supreme Court's review was limited to McCottry's initial statements, in which she told the 911 operator the name of her assailant. The Supreme Court held that these early statements, made while Davis

---

**3.** *Davis* was heard by the Supreme Court together with an appeal of the Indiana Supreme

Court's decision in *Hammon v. Indiana,* 829 N.E.2d 444 (Ind.2005).

was still in the house, were not testimonial because the operator was questioning McCottry at that time for the primary purpose of enabling police assistance to resolve an "ongoing emergency." *Id.* at 2277. The court mentioned several factors it considered in making this determination: (1) whether the declarant was speaking about events as they were actually happening or describing past events; (2) whether the declarant was facing an ongoing emergency; (3) whether the nature of the questions asked by law enforcement were such that they elicited statements necessary to resolve the present emergency rather than simply to learn about past events; and (4) the level of formality of the interrogation. The Court went on to speculate about the interrogation that occurred after Davis left the house and McCottry was no longer in imminent danger:

> This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, "evolve into testimonial statements," [*Hammon v. Indiana,*] 829 N.E.2d [444, 457 (Ind.2005),] once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford.* This

presents no great problem. Just as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statements that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.

*Id.* at 2277–78 (some citations omitted).

Gayden argues that Epperson's entire 911 call should have been excluded because it was testimonial.[4] Jones testified that Epperson had driven approximately one-half mile away from Gayden's house before she called 911. Gayden suggests that because the women were somewhat removed from the scene of the crime, they were not in the midst of an ongoing emergency. We note, however, that Jones testified that there had been gunshots and a violent smashing of Epperson's windshield only minutes before. Also, Epperson's voice sounds rather frantic at the beginning of the recording.

The operator initially questioned Epperson about the perpetrator's identity and the location of the incident for the apparent purpose of dealing with the present emergency. Epperson named Michael Gayden, Jones assisted Epperson in providing the operator with the correct spell-

---

4. The recording of Epperson's 911 call is included in the record without a transcription. We did not attempt to transcribe it here, as it is frequently unintelligible. The trial transcript indicates that portions of the 911 recording were redacted prior to trial because they were deemed testimonial. After the recording was played for the judge, Gayden's counsel said, "[T]hroughout the 911 call, how many times did we have to redact their mention to [sic] Michael being on home detention?" Tr. at 83.

ing of Gayden's name, and Epperson drove back by Gayden's house where she and Jones could see the exact address, which they provided to the operator. While near Gayden's house, they stated that they saw two boys running down an alley near the house with a gun, and in response to the operator's questions, Epperson described their clothing as well as her recollection of what Gayden was wearing. This portion of the 911 call clearly enabled the operator to send police assistance to assess the situation and locate the perpetrator, making Epperson's statements non-testimonial pursuant to the Supreme Court's rationale in *Davis.*

There are portions of the 911 recording that might be properly classified as testimonial under *Davis* and *Crawford.* For example, Epperson volunteered to the operator that the police would find ammunition shells in Gayden's yard and that the gun might be somewhere in his back yard or in a white car parked at his house. Also, toward the end of the call, the operator asked, "Why would he do this?" Epperson explained that Gayden was the ex-boyfriend of one of her friends and that "he got mad" at them but that she did not know why. These comments suggest that at least part of the 911 call dealt with information relevant to an investigation of past events rather than information necessary to end a dangerous situation and apprehend the suspect.[5]

On the morning of trial, the trial court listened to the recording of Epperson's 911 call. Immediately afterward, Gayden's counsel objected to the admission of the entire tape, stating in relevant part as follows:

> [O]ur position is that [Epperson and Jones's] entire reason for calling [911] is

because they knew Michael was on home detention and they knew they could get him in trouble with home detention by making this call and because they were upset about somebody at that house busted their windshield. They were pissed off, they wanted somebody, so they called on Michael. Their motive—there [sic] principal motive, our argument, in making this call was to get Michael in trouble, to get the cops there.

Tr. at 83. At trial, Gayden's counsel renewed this objection when the State offered the 911 recording. Tr. at 94.

 To preserve a claim of error regarding the admission of evidence, the trial objection must include the specific ground for the exclusion of the evidence. *See Coates v. State,* 650 N.E.2d 58, 61 (Ind.Ct. App.1995) (statement of reason for objection must be "full and comprehensive"). Also, the objector must be specific as to the part or parts of the evidence being objected to. *Baker v. Wagers,* 472 N.E.2d 218, 220 n. 2 (Ind.Ct.App.1984) (where document contained hearsay and non-hearsay, it was objector's burden to identify hearsay portion and specifically object and move to strike that portion), *trans. denied* (2005). If the evidence is admissible in part and the objection is not confined to the inadmissible portion, no claim of error is preserved if the objection is overruled. *Senco Products, Inc. v. Riley,* 434 N.E.2d 561, 565 (Ind.Ct.App.1982) (where only part of the evidence to which a general objection is made is subject thereto, the objection is properly overruled).

Here, the 911 recording contained nontestimonial evidence *and* evidence that is arguably testimonial. Gayden purposefully objected to the entire recording as tes-

---

**5.** We need not address the other relevant questions identified in *Crawford*—whether Epperson was unavailable to testify and whether

Gayden had had a prior opportunity to cross-examine her—as these were not raised by the State and are thus not at issue here.

timonial, on the basis that Epperson's purpose in making the call, from the beginning, was to make incriminating statements about Gayden. Because at least a portion of the recording included non-testimonial evidence, the trial court did not abuse its discretion by overruling Gayden's objection to the entire recording, and the issue is waived for review.

## II. Sufficiency of the Evidence

■ Gayden also claims that the State failed to present sufficient evidence to sustain his conviction. When reviewing sufficiency challenges, we do not reweigh the evidence or assess witness credibility. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind. 2003). We must affirm the conviction "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005).

Specifically, Gayden argues that Officer Lewis's testimony regarding Jones's statements to him on the night of the incident were admissible only for impeachment purposes because Jones had been released from her subpoena and was not available for cross-examination. *See Modesitt v. State*, 578 N.E.2d 649, 652 (Ind.1991). Indeed, when Gayden made a hearsay objection at trial, the State responded that this portion of Officer Lewis's testimony was for impeachment purposes, and the trial court allowed it on that basis. Tr. at 114. Gayden claims that if Officer Lewis's account of Jones's prior statements is not

admissible as substantive evidence, then the State's case must fail. We disagree. In addition to Officer Lewis's testimony impeaching the only eyewitness to testify at trial, the evidence included Epperson's identification of Gayden on the 911 recording,[6] the recovery of shell casings and a live round from Gayden's yard, officers' discovery of a gun consistent with the one used in this crime in a detached garage behind Gayden's house, and Gayden's threatening statement to Epperson and Jones as he was taken into custody. In our view, this evidence and reasonable inferences therefrom could have allowed a reasonable jury to find Gayden guilty beyond a reasonable doubt.

Affirmed.

SULLIVAN, J., and SHARPNACK, J., concur.

---

6. We recognize that by applying the U.S. Supreme Court's guidelines regarding testimonial vs. non-testimonial statements in 911 recordings, we have reached a counterintuitive result by concluding that Epperson's identification of Gayden on the 911 recording was "non-testimonial" for purposes of the Sixth Amendment but that at least some portion of

the recording was properly admitted as the State's only substantive evidence against Gayden in this case. An artificial construct of the Supreme Court, the testimonial/ non-testimonial construct is somewhat ironic in this context. However, we are left with the irony, pending further enlightenment.