Michael D. COLLINS, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 27A02–0612–CR–1117.

Court of Appeals of Indiana.

Sept. 12, 2007.

C. Robert Rittman, Marion, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Michael D. Collins appeals from his conviction for Murder.[1] Collins claims that the trial court abused its discretion in admitting certain out-of-court statements made to a 911 dispatcher, in admitting his videotaped statement to police, in admitting photographs of his victim's body, and in declining his request to instruct the jury on voluntary manslaughter. We affirm.

## FACTS

Early in the evening of April 17, 2003, Michael Collins came to the duplex on Race Street in Marion where his girlfriend Tabitha Weirick lived, looking for her. Collins was irritated at Weirick because, earlier in the day, she had wanted him to stay behind while she went to unlock her ex-boyfriend's door for him. A short time later, Collins returned with Jerry Downs, only to find again that Weirick was not home. Michele Jaynes and Kenny Kendall, who shared the other half of the duplex, agreed to help Collins and Downs find Weirick, and so the quartet drove around for a time in an unsuccessful search.

At approximately 9:00 p.m., Collins and Downs returned Jaynes and Kendall to the duplex. At approximately 11:00 p.m., Jaynes received a telephone call from either Collins or Downs, who asked if she and Kendall wanted to come over and "party with 'em." (Tr. 297). Kendall and Jaynes agreed, and Jaynes arranged for a neighbor to look after her children.

After approximately two hours at Collins and Downs's, spent drinking and "s[itting] around," Jaynes and Kendall left for home. (Tr. 303). Upon arriving, Kendall went to the kitchen and turned on the light. As he did, Jaynes said "what the f[* * *,]" and Kendall turned to see that Downs was holding her around the waist and that he was also pointing a gun at him. (Tr. 306). Meanwhile, Collins searched Weirick's apartment to no avail.

Kendall eventually convinced Downs to come outside with Jaynes, and Collins soon joined the trio. Collins wanted Jaynes to drive him and Downs on another search for Weirick, and, when Kendall took the keys from Jaynes's car and said, "ain't nobody going in there," Collins drew a handgun and held it to Kendall's head. (Tr. 308–09). When Kendall challenged Collins to shoot him, Jaynes intervened and told Collins, "I'll take ya anywhere you wanna go." (Tr. 310).

Jaynes drove away, with Collins in the front passenger seat and Downs in the back seat. Approximately thirty minutes later, Jaynes called Kendall and told him that she loved him and "to look out for her kids." (Tr. 317). At some point, Collins shot Jaynes once in the head, killing her. After moving Jaynes's body to the passenger side, he drove Downs home, where Downs gave him a gasoline can after advising him to dispose of the body. Collins drove the car to a secluded area in Grant County, doused it with gasoline, and set it aflame.

Soon thereafter, Collins jumped onto a nearby train headed into Marion. After Collins dropped him at home, Downs and his girlfriend removed approximately fifty to sixty marijuana plants from the garage. Then, at approximately 2:34 a.m., Downs called 911 and told the dispatcher that

---

1. Ind.Code § 35–42–1–1 (2003).

Collins "had shot a Michele girl, but he did not know her last name." (Tr. 129). Downs identified himself and said that the shooting had occurred in a white vehicle, he did not know where Collins was, and Collins had told him that if he said "anything to anyone" he would kill him. (Tr. 130). Because of the tone of Downs's voice, "the agitation, [and] the repeating of his sentences," the dispatcher concluded that he was "very upset[.]" (Tr. 130–31).

At 5:39 a.m., Marion Police Officer Kent Wilson encountered Collins walking on a road shoulder. When Officer Wilson approached Collins, he noticed what appeared to be dried blood on his face, hands, and pants. Collins told Officer Wilson that he had been in a motorcycle accident and that his name was Jerry Downs. Later that morning, Grant County Detective Sergeant Kevin Pauley videotaped an interview with Collins. Twice during the interview, Collins made utterances related to obtaining counsel, asking, "Do I need an attorney?" and commenting, "I probably need an attorney." (Defendant's Ex. A at 112, 124).

After a jury trial, Collins was found guilty of murder, Class B felony criminal confinement, Class D felony abuse of a corpse, Class D felony arson, and Class D felony pointing a firearm. Following the second and third phases of his trifurcated trial, Collins was found guilty of Class B felony possession of a firearm by a serious violent felon and was found to be a habitual offender. On direct appeal, this Court reversed Collins's murder conviction and remanded for further proceedings. *See Collins v. State*, 826 N.E.2d 671 (Ind.Ct. App.2005), *reh'g denied, trans. denied.* Among the claims Collins made in his first direct appeal, and one that this court decided against him, was that the trial court had abused its discretion in admitting several photographs of the burned-out car,

including one that showed Jaynes's severely burned body on the floorboard as well as additional photographs showing bones loose in the car and Jaynes's autopsy. *Id.* at 680.

Prior to Collins's second trial, the trial court denied his motion to suppress evidence related to Downs's 911 call and his videotaped statement. After the second trial, a jury again found Collins guilty of murder, and the trial court sentenced him to sixty-five years of incarceration (enhanced thirty years by virtue of his status as a habitual offender), to be served consecutively to the sentences imposed for his prior convictions, for an aggregate sentence of 144 years.

## DISCUSSION AND DECISION

### Standard of Review for Issues I–III

The admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse the trial court's determination only for an abuse of that discretion. *State v. Lloyd*, 800 N.E.2d 196, 198 (Ind.Ct.App.2003). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

### I. Downs's 911 Call

 Collins contends that the admission of Downs's out-of-court statements, as related in Baker's testimony regarding Downs's 911 call, violate his Sixth Amendment right to confront the witnesses against him under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Under the rule announced in that case, the Sixth Amendment does not permit the admission of "testimonial" statements of a witness who does not appear at trial unless he or she is unavailable to testify and the defendant had a prior opportunity for cross-examination of the witness. *Id.* at 53–54, 124 S.Ct.

1354. Although the *Crawford* court did not provide a precise definition of "testimonial," the United States Supreme Court revisited the question in *Davis v. Washington*, — U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court clarified the meaning of "testimonial" by explaining that

> [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74. In concluding that the statements at issue in *Davis* were not testimonial, the Court considered several factors: (1) whether the declarant was describing past events or current events, (2) whether the declarant was facing an ongoing emergency, (3) whether the questions asked by law enforcement were such that they elicited responses necessary to resolve the present emergency rather than learn about past events, and (4) the level of formality of the interrogation.[2] *Gayden v. State*, 863 N.E.2d 1193, 1197 (Ind.Ct.App. 2007) (citing *Davis*, 126 S.Ct. at 2276–77) *trans. denied.*

Applying the *Davis* factors, we conclude that, under the circumstances, the questions Grant County Sheriff's dispatcher Kathy Baker asked Downs objectively had the primary purpose of enabling police to meet an ongoing emergency, *i.e.*, the capture of an alleged murderer who was then at large and very possibly armed and dangerous. First, the "continuously very upset" Downs told Baker that "that man he killed her." (Tr. 128, 130). Baker asked who had killed whom, a perfectly reasonable attempt to identify a very possibly armed-and-dangerous murderer to aid police in his apprehension, for their protection and that of the public. Baker then asked Downs "where it had happened[,]" again a perfectly reasonable inquiry designed to aid police in locating Collins. Baker asked in what sort of vehicle the killing had occurred, again a reasonable question considering that Collins was very possibly still driving it. Finally, Baker also asked Downs if he knew where Collins was, yet another question obviously designed to aid police in his location and capture.

Applying the first of the *Davis* factors, we observe that, although Downs primarily

---

2. We do not mean to suggest that the four factors relied upon by the *Davis* court represent an exhaustive list, that all four will be relevant in all cases, or that they represent "elements" that must all be satisfied before testimony can be determined to be nontestimonial. First, nothing in *Davis* suggests that any of the above is the case. Second, strict application of the factors would not necessarily lead to logical results in all cases. For example, as in this case, although official questions may deal primarily with past events, they nevertheless may be designed to meet an ongoing emergency. Questions such as "What did he do?", "What was he wearing?" and "In which direction was he headed?" refer to past events and yet are obviously designed to assist in assessing the present threat and aiding in present identification and location of a person. Moreover, given that the overall characteristic of nontestimonial statements is that they be "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency[,]" *Davis*, 126 S.Ct. at 2273, we see no reason that statements by a 911 caller "crying wolf" would not be admissible so long as the objective purpose of the questions to the caller was designed to meet the fabricated emergency.

told Baker of past events, those occurrences served to establish whether Collins posed a *present* danger; the police could only deal with the situation in an appropriate manner by knowing Collins's identity, what he had done, the type of vehicle he might be driving, and where he might be. Second, we conclude that, despite his delay in calling authorities, Downs was, in fact, facing an ongoing emergency. Downs had just seen Collins shoot Jaynes in the head, did not know his whereabouts, and had been threatened with death if he told anyone what he had seen. If Collins had returned to find Downs on the telephone with the authorities, Downs could reasonably have believed that Collins would kill him as well. Third, Baker's questions were designed to meet the current emergency by establishing the shooter's identity, what sort of vehicle he might be driving, and where he might have been at the time, all of which would aid in his apprehension. Finally, the conversation occurred during a very informal 911 call, with the agitated Downs providing answers regarding an ongoing emergency over the phone, not, for example, calmly relating past events in a relatively tranquil police station interrogation room. In sum, the circumstances surrounding Baker's questioning of Downs objectively indicate that their primary purpose was to assist police in meeting an ongoing emergency. As such, Downs's statements were not testimonial and their admission therefore did not violate Collins's Sixth Amendment rights.

## II. Collins's Videotaped Statement

### A. *Miranda*

 Collins contends that the admission of his videotaped statement violated his Fifth Amendment right against self-incrimination. When an accused is subjected to custodial interrogation, the State may not use statements stemming from the interrogation unless it demonstrates the use of procedural safeguards to secure the accused's privilege against self-incrimination. *Davies v. State*, 730 N.E.2d 726, 733 (Ind.Ct.App.2000)(citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), *trans. denied.* The *Miranda* warnings apply only to custodial interrogation because they are meant to overcome the inherently coercive and police dominated atmosphere of custodial interrogation. *Id.* When a subject is in custody, *Miranda* requires that he be informed of the right to the presence and advice of counsel during custodial interrogation by the police, of the right to remain silent, and that any statement he makes may be used as evidence against him. *Wright v. State*, 766 N.E.2d 1223, 1229 (Ind.Ct.App.2002).

 Even if the accused has been advised of his rights and has validly waived them, if he invokes the right to counsel, the police must cease questioning until an attorney has been made available or until the accused initiates further conversation with the police. *Sauerheber v. State*, 698 N.E.2d 796, 801 (Ind.1998) (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). We determine whether an accused has asserted the right to counsel on an objective standard. *Id.* (citing *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Invocation of this right requires, at a minimum, some statement that can be reasonably construed as an expression of a desire for the assistance of an attorney. *Id.* at 803 (noting that police have no duty to cease questioning when an equivocal request for an attorney has been made). "The level of clarity required to meet the reasonableness standard is sufficient clarity such that a 'reasonable police officer in the circumstances would understand the statement to be a

request for an attorney.' " *Taylor v. State,* 689 N.E.2d 699, 703 (Ind.1997) (quoting *Davis,* 512 U.S. at 462, 114 S.Ct. 2350).

It is not enough that the defendant might be invoking his rights; the request must be unambiguous.... *Davis* established as a matter of Fifth Amendment law that police have no duty to cease questioning when an equivocal request for counsel is made. Nor are they required to ask clarifying questions to determine whether the suspect actually wants a lawyer.

*Id.*

■ Collins twice mentioned attorneys, asking, "Do I need an attorney?" and then later observing, "I probably need an attorney." [3] Following the second comment, Collins also asked how long it would take to obtain an attorney, and was told that he could not have one appointed immediately. Neither of these utterances amounts to an unequivocal request for an attorney. The first is merely a question. The second is merely an observation, rendered equivocal by Collins's use of the word "probably." Had Collins said, "I definitely need an attorney" or "I need an attorney, now," our conclusion might well be different, but he said neither of those things. As it was, Collins's statement does not rise to the level of clarity such that a reasonable officer would understand it to be a request for an attorney.

Moreover, after both utterances, Collins initiated further conversation before Detective Sergeant Pauley resumed questioning him. When Collins asked if he needed an attorney, Detective Sergeant replied, "Well, that's up to you." (Defendant's Ex. A at 113). Collins then said, "No, I don't, I don't know, I don't know what happened[,]" an unprompted resumption of discussion regarding the events of the previous night. (Defendant's Ex. A at 113). After Collins said, "I probably need an attorney[,]" he asked how long it would take to obtain one. (Defendant's Ex. A at 124). After Detective Sergeant Pauley explained that the trial court would have had to appoint one and that it would be "at least Monday[,]" [4] Collins immediately resumed the conversation by asking several questions about Downs. (Defendant's Ex. A at 124–25). The admission of the videotaped statement did not violate *Miranda.*

### B. Adequate Redaction

Collins's pretrial motion *in limine* regarding his videotaped interview was granted such that no "references to what Jerry Downs said" could be put before the jury. (Appellant's App. 112). Collins contends, however, that his videotaped statement was inadequately redacted in that the version shown to the jury still contained "numerous examples of hearsay statements originating with Jerry Downs but being spoken by the interrogator, Pauley." (Appellant's Br. 19). Collins cites the following excerpts as allegedly violating the motion *in limine* by referring to statements by Downs:

[Detective Sergeant Pauley]: Do you remember getting so upset Mike, do you remember getting so upset, that you

---

**3.** The second statement by Collins was originally transcribed as "I f[* * * * *] need an attorney[,]" and Collins relies on the original transcript, which was admitted as an exhibit at the suppression hearing. Detective Sergeant Pauley, however, who conducted the interview, testified at that hearing that Collins, in fact, said "I probably need an attorney" and that the transcript was mistaken in

this regard. (Tr. 61). Moreover, although the audio is not of the highest fidelity, our review of the videotape in question reveals that Collins said "I *probably* need an attorney."

**4.** The interview between Collins and Detective Sergeant Pauley occurred on a Friday.

took that gun that was in that car, and you shot Michele with it?

[Collins]: No, No.

. . . .

[Detective Sergeant Pauley]: Real close now, I mean we're getting real close to, to Tabby's house. You didn't get very far from Tabby's house before Michele was shot.

[Collins]: You're telling me I shot Michele? That's what you're telling me?

. . . .

[Detective Sergeant Pauley]: And after you shot Michele, and she ran into a parked car, you actually got out of the car, pulled her body from the behind the seat towards the passenger's side, and drove that car back to 400 East, where you've been living for two months, and dropped Jerry off, after he witnessed something terrible. And I think the only reason you didn't shoot him is you called him your little brother, are you guys brothers?

. . . .

[Collins]: You're saying I shot Michele, and I almost shot my little brother too?

[Detective Sergeant Pauley]: Will, I don't know why you didn't shoot him, uh he just witnessed you shoot somebody else.

. . . .

[Collins] Hahh, I don't know, you're telling me that I shot Michele and drove her to my little brother's house, and dropped my little brother off. That's what you're telling me.

(Defendant's Ex. A at 110–12).

■ Collins's claim in this regard first must fail because he does not argue, much

less establish, how any of the alleged errors might have prejudiced him. "This court will disregard technical errors or defects which did not prejudice the substantial rights of a defendant." *Brown v. State*, 245 Ind. 604, 609, 201 N.E.2d 281, 283–84 (1964) (citing *Wright v. State*, 237 Ind. 593, 147 N.E.2d 551 (1958)). In any event, the passages pointed to by Collins do not, in fact, contain any references to any statement by Downs and therefore did not violate the trial court's order. While the jury may have inferred that some of Detective Sergeant Pauley's questions were based on information obtained from Downs, it heard no direct reference to any statement, which is all the order prohibited. The trial court did not abuse its discretion in admitting the redacted videotape of Collins's interview.

### III. Photographs of Jaynes's Body

■ Collins contends that the trial court abused its discretion in admitting photographs of Jaynes's body as it was found in her burned-out car, specifically State's Exhibits 8, 104, 105, and 109. We conclude, however, that this claim is barred by *res judicata*, specifically the branch of *res judicata* known as issue preclusion. "The doctrine of *res judicata* prevents the repetitious litigation of disputes that are essentially the same." *Afolabi v. Atlantic Mortg. & Inv. Corp.*, 849 N.E.2d 1170, 1173 (Ind.Ct.App.2006) (citing *French v. French*, 821 N.E.2d 891, 896 (Ind.Ct.App.2005)). "The principle of *res judicata* is divided into two branches: claim preclusion and issue preclusion, also referred to as collateral estoppel." [5] *Id.*

---

**5.** In appeals following criminal convictions, questions involving *res judicata* arise most frequently in post-conviction proceedings, which are actually quasi-civil in nature. *See, e.g., Hall v. State*, 849 N.E.2d 466, 472 (Ind.

2006). The doctrine, however, does apply equally in purely criminal contexts. *See, e.g., Townsend v. State*, 632 N.E.2d 727, 731 (Ind. 1994) (in a double jeopardy context, noting that "collateral estoppel requires that when

Issue preclusion, or collateral estoppel, bars the subsequent litigation of a fact or issue that was necessarily adjudicated in a former lawsuit if the same fact or issue is presented in the subsequent lawsuit. Where collateral estoppel is applicable, the former adjudication will be conclusive in the subsequent action even if the two actions are on different claims. However, the former adjudication will only be conclusive as to those issues that were actually litigated and determined therein. Collateral estoppel does not extend to matters that were not expressly adjudicated and can be inferred only by argument. In determining whether to allow the use of collateral estoppel, the trial court must engage in a two-part analysis: (1) whether the party in the prior action had a full and fair opportunity to litigate the issue and (2) whether it is otherwise unfair to apply collateral estoppel given the facts of the particular case.

*Id.* at 1175–76 (citing *Indpls. Downs, LLC v. Herr*, 834 N.E.2d 699, 702 (Ind.Ct.App. 2005), *trans denied* (2006) (internal citations omitted)).

The issue of the admissibility of certain allegedly gruesome photographs, including one showing Jaynes's charred body on the floorboard, was fully litigated in Collins's first appeal and decided against him. There is no indication, and Collins does not claim, that he was unable to fully and fairly litigate the issue before. The only question, then, is whether it would be otherwise unfair to apply collateral estoppel in this case. We conclude that it would not be.

Collins's claim in this regard is that the photographs in question should not have been admitted in his second trial because

he was no longer being tried for abuse of a corpse, as he was in his first trial. While this court did note that the photographs were relevant to prove abuse of a corpse, this was not the sole basis of its ruling.

Here, Collins challenges the admission of several photographs depicting the burned-out car at different angles. Of these pictures, one shows the charred remains of the body on the floorboard. The remaining photographs which he challenges are various pictures of bones found lying loose in the car, as well as several photographs taken during an autopsy. *Those photographs are gruesome and repulsive; however, they do depict the injuries which Michelle suffered, including the gunshot wound to the head which was the cause of death.* Furthermore, they are highly probative of the evidence needed to prove the crimes with which Collins was charged. While Collins and the State may have stipulated that the car was burned and that Michelle was inside, the charge for Abuse of a Corpse required that the State prove that the corpse was mutilated, a finding which could not be readily made without the jury reviewing the gruesome photographs of the body. *See* I.C. § 35–45–11–2. Additionally, the photographs of the burned-out car cannot be declared to be highly prejudicial. Other than the one photograph depicting the body, they reveal basic photographs of the burnt remains of the car. The trial court did not err in admitting the photographs into evidence.

*Collins*, 826 N.E.2d at 680 (emphasis added).

In other words, this court relied on three grounds to conclude that the photo-

the State has received an adverse decision of a critical issue of fact in a trial, that adverse decision prevents later relitigation of the

same issue in a later prosecution") (citing *Harris v. Washington*, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971)).

graphs challenged in the first appeal were admissible: they were relevant to show the extent of Jaynes's pre-burning injuries, they were relevant to prove abuse of a corpse, and they were not overly prejudicial in any event, as only one clearly depicted the body in the burned out-car. We will not revisit this court's prior conclusion that photographs of Jaynes's body were relevant to show the injuries she suffered prior to her immolation, including the gunshot wound to her head that killed her.[6] Moreover, the first *Collins* court, by noting that the photograph of Jayne's body was relevant to show the extent of her injuries, in particular the gunshot wound to her head, limited that rationale to the murder charge. As that particular ground for admission has nothing to do with Collins's being charged with abuse of a corpse, our interpretation of this court's original ruling on the matter is that it found that ground, by itself, sufficient to admit the photographs as related to Collins's murder charge. Under the circumstances, we conclude that it would not be unfair to apply collateral estoppel to Collins's claim in this regard.

### IV. Voluntary Manslaughter Instructions

 Collins contends that the trial court abused its discretion in refusing to instruct the jury on the lesser offense of voluntary manslaughter.

In deciding whether to give a tendered instruction on a lesser included offense, the trial court is required to determine whether the offense is either inherently or factually included in the charged offense and whether there is a serious evidentiary dispute regarding any element that distinguishes the greater offense from the lesser offense. Voluntary manslaughter is an inherently included lesser offense of murder. The only element distinguishing murder from voluntary manslaughter is "sudden heat," which is an evidentiary predicate that allows mitigation of a murder charge to voluntary manslaughter. "Sudden heat" is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. An instruction on voluntary manslaughter is supported if there exists evidence of sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection. Any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter.

*Washington v. State*, 808 N.E.2d 617, 625–26 (Ind.2004) (citations omitted).

Collins points to evidence in the record indicating that he was angry before he shot Jaynes. Be that as it may, it is well-settled that "[a]nger standing alone is not sufficient to support an instruction on sudden heat[,]" *Wilson v. State*, 697 N.E.2d 466, 474 (Ind.1998) (citing *Matheney v. State*, 583 N.E.2d 1202, 1205 (Ind.1992)), and, moreover, no evidence indicates that

---

**6.** It seems that only one photograph clearly showing Jaynes's body was admitted in Collins's first trial, *see Collins*, 826 N.E.2d at 680, whereas four were admitted here. (*See* State's Exs. 8, 104, 105, 109). We do not see how four photographs of the body would be any more prejudicial than one, at least when, as here, none seem any more gruesome than the others, and Collins does not argue this point. In any event, even the erroneous admission of evidence will constitute harmless error when it is merely cumulative of other properly admitted evidence. *See, e.g., Hyppolite v. State*, 774 N.E.2d 584, 592 (Ind.Ct. App.2002) ("Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted."), *trans. denied.*

Collins was angry *at the time of the shooting*. Indeed, the only evidence in record relating to Collins's state of mind immediately before the shooting comes from his own statement, in which he claims several times that he felt no anger at all toward Jaynes. In the absence of appreciable evidence of sudden heat, the trial court properly refused to instruct the jury on voluntary manslaughter.

The judgment of the trial court is affirmed.

NAJAM, J., and MATHIAS, J., concur.