

FILED

Jul 25 2017, 7:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brendan K. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ludina Roshida Wallace, | July 25, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 71A03-1702-CR-364 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, | The Honorable Elizabeth C. Hurley, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 71D08-1509-F6-692 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Ludina R. Wallace (Wallace), appeals her conviction for criminal recklessness, a Class A misdemeanor, Ind. Code § 35-42-2-2.

We affirm.

# ISSUE

Wallace raises one issue on appeal, which we restate as follows: Whether the trial court abused its discretion by admitting the recording of a 9-1-1 call into evidence.

# FACTS AND PROCEDURAL HISTORY

On August 16, 2015, at approximately 7:00 p.m., Deja Cline (Cline) went to a gas station to purchase gasoline for her friend's vehicle. In addition to her friend, Cline was accompanied by her toddler. At the same time, Michael Jackson (Jackson), was at the gas station. Jackson and Cline were previously in a relationship, and Jackson is the father of Cline's toddler. For some reason, Jackson removed the child from Cline's vehicle, placed the child in his vehicle, and drove away. Upset by Jackson's actions, Cline called Jackson, and the two argued about his removal of their child from her vehicle. Cline informed him that she was on her way to his house, located at 1043 North Adams Street in South Bend, St. Joseph County, Indiana, to pick up the child.

Upon arrival at Jackson's house, Cline "parked in the middle of the street basically kind of close to the curb but not parking actually. So in the middle of

the street." (Tr. Vol. II, p. 9). Cline observed that, in addition to Jackson and their son, Jackson's ex-girlfriend—Wallace—was also present. Cline and Jackson engaged in a "verbal altercation." (Tr. Vol. II, p. 10). At some point, supposedly after Wallace interjected that Cline and Jackson should not be fighting as they were in front of the child, Wallace also became involved in an argument with Cline. The exchange of "obscenities and profanities" between Cline and Wallace intensified to the point where Cline "was angry enough to say that [she] would do something to [Wallace's] vehicle." (Tr. Vol. II, pp. 12, 24). Cline claimed that she threatened to "kick" Wallace's vehicle. (Tr. Vol. II, p. 12). According to Wallace, however, Cline said she was "going to tear that B [*sic*] car up." (Tr. Vol. II, p. 62).

[6] Wallace and Cline offered drastically different accounts as to what occurred next, but it is undisputed that Wallace withdrew her .380 semiautomatic handgun and fired multiple shots. Wallace claimed that Cline, after running toward Wallace's vehicle, turned around and was holding a small paring knife. Upon seeing the knife, Wallace purportedly removed her pistol from her hip holster but did not point it at Cline. Instead, Wallace stated that she asked Cline to move away from her vehicle because she "just wanted to take [her] car and leave." (Tr. Vol. II, p. 63). However, Cline "began to charge towards [Wallace]." (Tr. Vol. II, p. 63). In response, Wallace stated that she "started running backwards and . . . started shooting at the ground . . . to stop [Cline]." (Tr. Vol. II, p. 64). Even after Wallace ran back to her vehicle and tried to drive away, she claims that Cline "came from around the back of the car and [Cline]

swiped towards [Wallace,] and [Wallace] leaned over avoiding her swipe." (Tr. Vol. II, p. 65). It was at that point that Wallace pointed the firearm at Cline and asked that Cline let her leave, all the while ignoring Cline's attempts to goad her into fighting. When she was finally able to do so, Wallace claims that she drove away. On the other hand, Cline described that she was never in possession of a knife or any other weapon, and she denied that she ever charged at or approached Wallace. Rather, according to Cline, after she threatened to kick Wallace's vehicle and Wallace saw that Cline was approaching her vehicle, Wallace shot her gun into the air multiple times before pointing the gun in Cline's direction and firing several more shots, one of which grazed Cline's shin.

[7] During this confrontation, Jackson had removed the child from his vehicle and placed the child in the front seat of Cline's vehicle. Jackson then inexplicably removed Cline's keys from the ignition and threw them onto a neighbor's roof. Jackson also called 9-1-1. Although most of the recorded 9-1-1 call is unintelligible due to a significant amount of yelling in the background, at the beginning of the call, Jackson provided the dispatcher with his address and reported that there is a "girl in the middle of the street, baby in the front seat . . . trying to fight another girl." (State's Exh. 1). After yelling at someone on the scene to "get your ass outta my van," Jackson instructed the dispatcher, "You need to get here, hurry up." (State's Exh. 1). Despite the subsequent repeated efforts of the dispatcher to glean information, such as whether anyone was in possession of a weapon, Jackson did not further respond. However, Jackson

did not hang up. Thus, in the recording, Jackson can be heard yelling at someone to "do it, shoot the shit outta the bitch. I'll get the baby. Shoot the shit outta the bitch." (State's Exh. 1). He also repeatedly shouted to "LaLa" that "police are on the way. Get your gun and go." (State's Exh. 1).

[8] When officers from the South Bend Police Department arrived, Jackson and Wallace were gone. Cline, however, was standing next to her vehicle in the middle of the street, holding onto her child. One of the officers climbed onto the neighbor's roof and retrieved Cline's car keys. Two .380 shell casings were recovered from the street. Although Cline's leg was bleeding, she declined medical treatment.

[9] On September 25, 2015, the State filed an Information, charging Wallace with criminal recklessness, a Level 6 felony, I.C. § 35-42-2-2(b)(1)(A). On December 8, 2015, Wallace filed a Notice of Defense of Justifiable Reasonable Force, claiming that she "was justified in using reasonable force when she reasonably believed that force was necessary to prevent imminence of serious bodily injury to herself, when confronted by the alleged victim in this case." (Appellant's App. Vol. II, p. 27). On September 7, 2016, Wallace waived her right to a jury trial. On November 21, 2016, the trial court conducted a bench trial, at the conclusion of which, the trial court found Wallace guilty. The trial court specifically found Cline's testimony to be more credible than that of Wallace and, accordingly, determined that "Cline was not engaged in behavior that could cause serious bodily injury to [Wallace. Thus, Wallace] was not justified in using deadly force to defend herself." (Appellant's App. Vol. II, p. 75). At

the sentencing hearing on January 26, 2017, the trial court entered a judgment of conviction for criminal recklessness as a Class A misdemeanor and imposed a one-year suspended sentence.

Wallace now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

On appeal, Wallace solely challenges the trial court's admission of the 9-1-1 recording into evidence. It is well established that "[t]he decision to admit or exclude evidence falls within the sound discretion of the trial court, and we review that decision only for an abuse of discretion." *Gayden v. State*, 863 N.E.2d 1193, 1195 (Ind. Ct. App. 2007), *trans. denied*. It is an abuse of discretion if the trial court's "decision is clearly against the logic and effect of the facts and circumstances before the trial court." *Id.* On review, our court does not reweigh evidence, and we consider conflicting evidence in favor of the trial court's ruling. *King v. State*, 985 N.E.2d 755, 757 (Ind. Ct. App. 2013), *trans. denied*. Uncontested evidence is considered in the defendant's favor. *Id.* Although Wallace's argument on appeal lacks cogency, her bases for challenging the admission of the 9-1-1 recording generally appear to reiterate the objections she raised at trial: hearsay, lack of confrontation, and unfair prejudice. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring an appellant's arguments to be "supported by cogent reasoning").

## II. *Hearsay*

[12] Wallace makes a perfunctory claim that the 9-1-1 recording should have been excluded as inadmissible hearsay. "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under a hearsay exception." *Young v. State*, 980 N.E.2d 412, 418 (Ind. Ct. App. 2012) (citing Ind. Evidence Rule 801); *see* Evid. R. 802. In this case, the parties do not dispute that Jackson's recorded call to 9-1-1 meets the definition of hearsay. Wallace contends that "[n]o hint exists in the record that [the 9-1-1 recording] was considered for any limited purpose, or under an exception to the rules against hearsay." (Appellant's Br. p. 12). However, during the trial, the State offered two exceptions to the hearsay rule to support admitting the 9-1-1 recording: as an excited utterance pursuant to Indiana Evidence Rule 803(2), or a present sense impression under Indiana Evidence Rule 803(1). The trial court agreed that "it would be a present sense impression" and that Jackson's statements were made in the course of "an ongoing emergency." (Tr. Vol. II, p. 22).

[13] Although the trial court seems to have admitted the 9-1-1 recording under the present sense impression exception to the hearsay rule, it is well established that our court may affirm an evidentiary decision based on any legal theory supported by the record. *Edwards v. State*, 724 N.E.2d 616, 620-21 (Ind. Ct. App. 2000), *trans. denied*. We choose to dispose of this matter by looking to the excited utterance exception set forth in Indiana Evidence Rule 803(2). An excited utterance is "[a] statement relating to a startling event or condition,

made while the declarant was under the stress of excitement that it caused." Evid. R. 803(2).

[14] As indicated by Rule 803(2), the test for determining whether the excited utterance exception applies requires three elements: "(1) a startling event or condition has occurred; (2) the declarant made a statement while under the stress or excitement caused by the event or condition; and (3) the statement was related to the event or condition." *Teague v. State*, 978 N.E.2d 1183, 1187 (Ind. Ct. App. 2012) (internal quotation marks omitted). "This test is not mechanical and admissibility turns on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications." *Id.* (internal quotation marks omitted). "An excited utterance can be made in response to a question so long as the statement is unrehearsed and is made under the stress of excitement from the event." *Id.*

[15] In the present case, Jackson called 9-1-1 in the midst of a serious altercation. Although Jackson did not specifically identify either participant, he urged the police department to respond quickly because two women were about to fight, and a baby was present. Thereafter, Jackson failed to respond to the 9-1-1 operator's questions and, in fact, may have believed that he had disconnected the call. Nevertheless, despite the yelling and commotion in the background, Jackson can be heard encouraging one woman to shoot the other and advising the same woman to collect her firearm and flee before the arrival of the police. It is apparent throughout the 9-1-1 call that Jackson was not reflecting prior to making any of his statements. *See id.* at 1188. Rather, he was speaking in the

heat of the moment in response to the excitement of the unfolding altercation between Wallace and Cline. We find that this clearly satisfies the requirements for an excited utterance. Therefore, the trial court did not abuse its discretion in admitting the 9-1-1 recording as there is a valid exception to the hearsay rule.

## II. *Confrontation Rights*

Wallace also claims that the introduction of the 9-1-1 recording "violated the confrontation clause of the Sixth Amendment to the Constitution of the United States."[1] (Appellant's Br. p. 11). In particular, Wallace asserts that, over her objection, the trial court "admitted the testimonial out of court statements of the State's witness Jackson, who did not testify and was not otherwise subject to [d]efense examination, and then used these out of court statements as proof of the matters asserted therein in a most explicit and uncomplicated manner." (Appellant's Br. p. 14). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "The right to confront witnesses, as granted by the federal . . . [C]onstitution[], includes the right of full, adequate, and effective cross-examination, which is fundamental and essential to a fair trial." *Kimbrough v. State*, 911 N.E.2d 621, 631 (Ind. Ct. App. 2009). As announced by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004),

---

[1] Wallace also asserts that the admission of the 9-1-1 recording violated her confrontation rights under "Article 1, Sec[tion] 11 [*sic*] of the Constitution of the State of Indiana." (Appellant's Br. p. 11). Other than a cursory mention of the Indiana provision, Wallace does not further develop this argument and, therefore, has waived it. *See Jackson v. State*, 735 N.E.2d 1146, 1150 n.1 (Ind. 2000).

"the Sixth Amendment does not permit the admission of 'testimonial' statements of a witness who does not appear at trial unless he or she is unavailable to testify and the defendant had a prior opportunity for cross-examination of the witness." *Collins v. State*, 873 N.E.2d 149, 153 (Ind. Ct. App. 2007), *trans. denied*.

[17] Accordingly, whether Wallace's confrontation rights were violated depends upon whether Jackson's statements to the 9-1-1 operator were testimonial or not.

> [S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 154 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). In evaluating whether statements at issue are non-testimonial, courts usually consider:

> (1) whether the declarant was describing past events or current events, (2) whether the declarant was facing an ongoing emergency, (3) whether the questions asked by law enforcement were such that they elicited responses necessary to resolve the present emergency rather than learn about past events, and (4) the level of formality of the interrogation.

*Id.* (citing *Davis*, 547 U.S. at 822).

[18]     Here, Wallace asserts that Jackson's statements were testimonial because

> [t]here was a minimal threat to Jackson at the time of the out of court statements, and the purpose of the questioning leading to the out of court statements was certainly for the purpose of establishing events relevant to Wallace's later prosecution, in particular the existence or nonexistence of factors relevant to her defense of [s]elf [d]efense, and as such the admission of the out of court statement constitutes . . . reversible error.

(Appellant's Br. p. 14).  We disagree.

[19]     The 9-1-1 recording reveals that Jackson called the police to report the ongoing incident—namely, that a fight between two females was imminent; there was a baby present; and that the police "need[ed] to get here, hurry up."  (State's Exh. 1).  In an obvious attempt to gauge the present danger of the situation, the dispatcher asked whether either of the females had a weapon, but Jackson offered no response.  Jackson's subsequent urging of someone to "do it, shoot the shit outta the bitch" illustrated the severity of the situation as it was unfolding.  (State's Exh. 1).  Although Jackson also yelled for "LaLa" to "get your gun and go" because the "police are on the way," this was not responsive to any question posed by law enforcement.  (State's Exh. 1).  Moreover, any statements offered by Jackson that *may* have incriminated Wallace were not elicited "in a relatively tranquil police station interrogation room."  *Collins*, 873 N.E.2d at 155.  Rather, Jackson called to report an emergency, and his subsequent voluntary statements were clearly made in response to the ongoing situation.  As such, Jackson's statements to the 9-1-1 operator were not

testimonial, and the admission of the recording did not violate Wallace's confrontation rights.

### III. *Unfair Prejudice*

[20] Wallace further claims that "there was a substantial danger of unfair prejudice" in admitting the 9-1-1 recording. Pursuant to Indiana Evidence Rule 403, the trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." "The balancing of the probative value against the danger of unfair prejudice must be determined with reference to the issue to be proved by the evidence." *Bryant v. State*, 984 N.E.2d 240, 249 (Ind. Ct. App. 2013), *trans. denied*. The weighing of the probative value of evidence against the danger of unfair prejudice "is a discretionary task best performed by the trial court." *Id.*

[21] Wallace contends that the admission of the 9-1-1 recording was unfairly prejudicial because she was unable to contradict Jackson's statements while also maintaining her 5th Amendment right to remain silent. We find no merit in Wallace's claim. As the State points out, "*[a]ll* incriminating evidence may have that effect but that does not render it unduly prejudicial, and [Wallace] cites to no legal authority to suggest that it does." (State's Br. p. 19 n.7 (emphasis added)). Furthermore, the relevant issue for the fact-finder was whether Wallace fired her handgun in self-defense against Cline, and the 9-1-1 call assisted the trial court with making a credibility determination concerning this fact. We find no basis in the record for reversing the trial court's decision.

# CONCLUSION

Based on the foregoing, we conclude that the trial court acted within its discretion in admitting the recording of the 9-1-1 call into evidence.

Affirmed.

Najam, J. and Bradford, J. concur