**FOR PUBLICATION**



FILED
Aug 06 2014, 8:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender Agency
Indianapolis, Indiana

**KAREN CELESTINO-HORSEMAN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| KEVIN DAVIS, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 49A05-1310-CR-523 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Kurt M. Eisgruber, Judge
Cause No. 49G01-1108-FA-61283

**August 6, 2014**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Following a bench trial, Kevin Davis was convicted of Class A felony robbery resulting in serious bodily injury.[1] He appeals and raises the following three restated issues:

I.    Whether the trial court abused its discretion by admitting a witness's out-of-court prior statements to police identifying Davis as one of two persons involved in the beating and robbery of victim Kevin Taylor ("Taylor");

II.   Whether the trial court abused its discretion when it admitted the depositions of two witnesses on the basis that they were unavailable to testify at trial; and

III.  Whether the evidence was sufficient to support Davis's conviction.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In the early hours of August 28, 2011, Taylor, then forty-eight years old, was riding his bicycle from a liquor store to his house, which was on 42nd Street in Indianapolis, Indiana. He was carrying a bottle of gin, and he had about one hundred dollars in cash with him, as well as some marijuana. As he pedaled home, he was stopped by a male juvenile, later identified as Tajh Johnson ("Johnson"), who asked Taylor if he had "a light." *Tr.* at 41. A second male juvenile, later identified as Davis, also approached. The youths stopped Taylor in front of Davis's residence. Taylor recognized Davis, having seen him at that residence before because Taylor biked past there on a regular basis when he rode his bicycle to work. Initially, a female juvenile was with Davis and Johnson as they spoke to Taylor, but during the conversation, she walked away and went into the residence.

---

[1] *See* Ind. Code § 35-42-5-1. We note that, effective July 1, 2014, a new version of this criminal statute was enacted. Because Davis committed his crime prior to July 1, 2014, we will apply the statute in effect at that time.

Johnson and Davis offered to sell marijuana to Taylor, and Davis showed him a baggie containing a green leafy substance. Taylor believed that the substance was fake, and he declined the marijuana. During this time, Taylor grew uncomfortable with the conversation. As he started to ride away, Davis grabbed Taylor's pocket and, as Taylor looked down, either Davis or Johnson struck Taylor in the back of the head with a very hard object, and he fell to the ground. He tried to get up, but he was repeatedly kicked in the face. Taylor could hear people laughing while he fell in and out of consciousness as he was "getting beat." *Tr.* at 50. When he regained consciousness, he found that he had been moved across the street, and his black and white Nike shoes were gone, as well as his bottle of Seagram's gin, the marijuana, the one hundred dollars in cash, and his blue and silver bicycle.

Taylor managed to walk about a block and a half home, and upon seeing his injuries, his wife called the police. Police arrived and called for an ambulance, and Taylor was transported to a hospital. He suffered a fractured skull, fractured nose, a crushed jaw, injuries to his eye, and extensive bleeding.

In August 2011, when this incident occurred, Davis was residing with his mother, Dorothy Davis ("Dorothy").[2] Dorothy's fourteen-year-old daughter, A.D., who was Davis's biological cousin and adoptive sister, also lived at the residence. On the afternoon of August 28, 2011, police received a call from Dorothy. She said she had information about a robbery that had occurred in front of her house the night before. Indianapolis

---

[2] Dorothy was Davis's biological aunt, who had adopted him at some earlier date.

Metropolitan Police Department ("IMPD") Officer Jason Rauch responded. Dorothy and A.D. were at the residence, along with fourteen-year-old L.H., who was another female cousin to Davis. L.H. had been at Dorothy's home at the time of the incident, and she identified Davis to Officer Rauch as one of the two individuals who robbed and beat Taylor. While he was there, Officer Rauch received a radio dispatch that the blue and silver stolen bicycle had been located outside a nearby restaurant.[3] Officer Rauch left Dorothy's residence and responded to the call. At the restaurant, officers found Davis and Johnson inside; they were detained and later transported to the IMPD robbery office at the City-County Building for questioning.

Shortly thereafter, police also transported Dorothy, A.D., and L.H. to the IMPD robbery office for questioning. L.H. gave a recorded statement to Detective John Green and identified Davis and Johnson as the two males involved in the beating of Taylor. A.D. had taken photographs of the scene on her cell phone, which she showed to Detective Green and forwarded to him by email. The pictures included images of the bloody sidewalk in front of her house, blood in the grass in the yard, and what appeared to be a blood-stained mop on the stairs to the outside porch.

Dorothy signed a consent to search her property, and IMPD officers recovered Taylor's stolen black and white shoes from the yard, and a Seagram's gin bottle from the trash. Officer Rauch observed what appeared to be blood on the sidewalk that someone had attempted to clean up, and he saw a bottle of cleaner outside the home. Police also

---

[3] Earlier that same day, Taylor's wife and son had seen someone riding Taylor's bicycle on or near 42nd Street, and they called the police, but the bicycle was gone by the time IMPD officers arrived.

recovered a brick appearing to have blood on it and the mop that was on Dorothy's porch steps. Upon his arrest, police took possession of Davis's shoes, which had blood on the top of them, as well as his shirt and shorts he had been wearing the prior night.

On August 31, 2011, the State charged sixteen-year-old Davis as an adult with Class A felony attempted murder and Class A felony robbery resulting in serious bodily injury. The parties appeared for trial on April 15, 2013, at which time Davis filed a waiver of jury trial. The State, however, explained that it was not ready to proceed on that date because Dorothy and A.D., who had personally been served twice with a subpoena, were not present. The trial court, rather than issuing a warrant as the State requested, set the matter for an order to show cause hearing the following day as to why they did not obey the subpoenas, and it set the matter for a bench trial on May 23, 2013. At the April 16, 2013 hearing, Dorothy appeared, but A.D. did not. The State served Dorothy in open court with subpoenas directing them to appear at the May 23 trial. The trial court ordered Dorothy to appear, advising her that if she failed to appear for that, the trial court would issue a body attachment and move forward with a contempt hearing. It further advised her that as the mother of A.D., she was required to make sure A.D. was present as well. L.H.'s mother was present in the courtroom at the April 16 hearing, and she advised that L.H. also was present but outside of the courtroom. The trial court advised L.H.'s mother that she was required to make sure L.H. appeared for trial on May 23. Dorothy and A.D. failed to appear for the May 23 trial date, and on June 13, 2013 the trial court held Dorothy in contempt and issued a bench warrant. About a month later, it ordered Dorothy to serve 180 days in the Marion County Corrections Program ("community corrections").

After one or more continuances, the bench trial commenced on September 27, 2013, and L.H. appeared at trial under subpoena. At first she refused to testify without an attorney being present, but the trial court explained that no charges were pending against her and that she was required to testify. As to the robbery on August 28, L.H. repudiated her out-of-court statement and testified that she had no recollection of witnessing the robbery or anything associated with it, nor could she recall speaking to any officers at Dorothy's home or giving a statement to Detective Green on August 28, 2011 at the City-County Building. Specifically, she denied that she told Detective Green that Davis hit someone in the head with a brick on August 28, 2011 or that she told A.D. that she saw that happen. She also denied that she witnessed Davis kick the person in the face when he was on the ground or that Davis took items from him and hid them by a tree. She denied seeing blood at Dorothy's house or seeing Davis clean up blood on the sidewalk.

The State also called Officer Rauch as a witness. With regard to events occurring on August 28, 2011, Officer Rauch testified to the initial run he made in response to the call from Taylor's wife reporting that she had seen her husband's bicycle, although it was gone when he arrived. He also described the subsequent visit to Dorothy's home in response to her call to police. Over Davis's hearsay objection, the trial court allowed Officer Rauch to testify that L.H. identified Davis as the person who committed the robbery the night before. *Tr.* at 108. Officer Rauch testified that he left Dorothy's home and responded to assist with the call that the stolen bicycle had been located outside a nearby restaurant, where Johnson and Davis were thereafter apprehended and detained. Officer Rauch did not participate in the subsequent interviews of witnesses that day at the IMPD

6

robbery office, but he witnessed the search of Dorothy's property pursuant to the consent to search that she signed. He observed blood on the sidewalk in front of her home which appeared as if someone had attempted to clean up, a bottle of cleaner, a mop with what appeared to be blood on it on Dorothy's porch, a missing brick from a line of landscaping bricks and another brick sitting alone by a tree in her yard, a Seagram's gin bottle recovered from the trash can, and a pair of black and white Nike shoes Dorothy had shown to him when he was at her home earlier in the day.

Dorothy and A.D. did not appear for trial, although there had been a number of attempts to secure their presence, including the day prior, when two prosecutors on the case went to Dorothy's home and noted that two cars registered in her name were in the driveway. When they knocked, a female inside asked who was there, and they explained the purpose was to deliver subpoenas. The woman or women inside refused to open the door, and prosecutors left the subpoenas in the door. The State sought to have Dorothy and A.D. declared unavailable and requested permission from the trial court to use their prior depositions. The State made a record to the trial court that the State had hand-served both of them "on numerous occasions" for past trial dates, for which they did not appear. *Id*. at 129. Dorothy had already been found in contempt of court for failing to appear at past trial dates set in this matter, and the trial court had ordered her to serve 180 days in community corrections, which had elapsed by the date of the current trial. Dorothy never brought A.D. to court nor had Dorothy appeared herself. The prosecutor advised the trial court:

7

> We are out of options[.] . . . We're mid-trial at this point. They're not here. They have not appeared yet again, and that's why I'm asking the Court to find they are unavailable in the sense that they refuse to comply with the process, they refuse to appear for trial, they refuse to testify despite us taking advantage of everything that I'm aware of that we're legally allowed to do as deputy prosecutors, and that's why we'd be asking to admit their two depositions as exhibits for the Court's review to see what they did say under oath when questioned about the case.

*Id*. at 131.

After further discussion on the issue, the trial court issued a bench warrant for the arrest of Dorothy and A.D., and it sent Detective Green to Dorothy's house in an attempt to bring her to court. When court reconvened that afternoon, the prosecutor reported that Detective Green and officers were at the house, where Dorothy's cars were parked, they announced themselves, knocked on the door, and no one inside responded. When presented with the possibility of obtaining a search warrant to go into the house to see if Dorothy or anyone was there, the trial court determined, "I'm [not] going to subject a warrant team to those circumstances of whatever's in that house. Under these circumstances, I think the State has made reasonable effort to procure the witnesses for this trial. They have not made themselves available." *Id*. at 138.

Based on this finding of unavailability, and during the subsequent testimony of Detective Green, the State offered into evidence the depositions of Dorothy and A.D. The trial court admitted the two depositions into evidence over Davis's objection.[4] The trial court also allowed into evidence, over Davis's hearsay objection, Detective Green's

---

[4] Davis's objection was that at the time the depositions were taken, Davis was being represented by different counsel, thus his current trial counsel had not had the opportunity to confront or cross-examine the witnesses with his own trial strategy. *Tr*. at 139.

testimony that L.H. in her recorded statement on August 28, 2011, identified Davis as one of two individuals who robbed and assaulted Taylor on August 28. *Id*. at 183.

In A.D.'s deposition, taken in October 2012, she acknowledged that L.H. was at A.D.'s home on the date of the robbery incident, and at that time, Johnson lived down the street from her. She also acknowledged previously having given a statement to Detective Green in which she had told him she had witnessed Davis and Johnson beating up a person outside her home. When asked if she had shown pictures to police of blood on the sidewalk of her home and the stained mop, she acknowledged that she did. However, A.D. also stated in her deposition that her prior statement to Detective Green was untrue and that she had lied because she felt "pressure" by "the police officers, my mother, everyone." *State's Ex*. 53 at 99. A.D. said that she "made up a story" to police based on what "random people in the neighborhood" had told her. *Id*. at 103, 106. When asked if she had shown a pair of shoes in her yard to police, she said she did not do that and if police said she had, they were lying. She stated that, although she and Davis communicated "a lot" during the last year that he had spent in jail on the robbery and attempted murder charges, Davis never asked her why she made up a story to police that resulted in his arrest and incarceration, and she never contacted Detective Green to tell him that she had lied in her statement. *Id*. at 113.

In Dorothy's deposition, taken the same date in October 2012, Dorothy, like A.D., acknowledged that L.H. was at her house on the night in question. Dorothy also acknowledged that she had shown to police on August 28, 2011, some shoes in her yard that may have been part of a robbery that had occurred in front of her house and that she had found Davis with a bottle of gin, which she dumped out. However, Dorothy said she

did not believe the story that A.D. told police after the incident, offering that perhaps A.D. had made it up "to impress somebody," and that, instead, she believed A.D.'s deposition testimony – that she did not witness anything or have any knowledge of Davis's involvement in the robbery. *State's Ex*. 54 at 121. When asked why she had called police on August 28, 2011, Dorothy stated that it was out of concern for what she believed was a gun in Davis's pocket, not because she wanted to report that he had been involved in a robbery.

The State also presented the testimony of Scott Grammer, a serologist in the biology section of the Indianapolis-Marion County Forensic Services Agency ("Crime Lab") and Shannin Guy, a forensic scientist with the Crime Lab. Guy testified that the brick that was found under Dorothy's tree had blood on it, and his testing revealed that the major contributor of that blood matched Taylor's DNA profile. Also, the blood staining on the top of Davis's left and right shoes matched Taylor's DNA, and the mop handle contained Davis's DNA. While a preliminary examination of the mop head indicated the presence of blood, testing could not confirm that fact, likely due to other cleaning residues that were present.

Rashaun Barnes, who met Davis while they were in the juvenile jail cellblock together for a seven-month period, testified that Davis told him that he tried to sell somebody some "weed" and "the dude" realized it was fake and tried to get his money back from Davis, at which time Davis hit him with a brick and Johnson, at Davis's instruction, retrieved items from the person's pockets. *Tr*. at 92. Barnes received a plea agreement in exchange for his testimony in court.

The trial court took the matter under advisement, later acquitting Davis of the attempted murder charge, but finding him guilty of Class A felony robbery resulting in serious bodily injury. The trial court sentenced him to term of thirty years, with four suspended. The twenty-six years were split, with twenty-five at the Department of Correction and one on home detention. Davis now appeals.

## DISCUSSION AND DECISION

### I.     Admission of L.H.'s Statements to Police

Davis contends that the trial court abused its discretion by admitting L.H.'s prior statements to Officer Rauch and Detective Green. The trial court is given wide discretion in ruling upon the admissibility of evidence. *Kendall v. State*, 790 N.E.2d 122, 126 (Ind. Ct. App. 2003), *trans. denied*. We review a trial court's evidentiary decision for an abuse of discretion and will reverse when the decision is clearly against the logic and effect of the facts and circumstances. *Id.*

Here, the trial court admitted the statements under Indiana Evidence Rule 801(d)(1)(C), which provides that out-of-court statements are not hearsay when the "declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made shortly after perceiving the person." The term "shortly" is relative, not precise; the purpose of the rule is to assure reliability. *Dickens v. State*, 754 N.E.2d 1, 6 n.6 (Ind. 2001). On appeal, Davis argues that "there was no showing made that L.H. actually saw Mr. Davis commit the acts," and rather, she was just repeating what she had heard other people say. *Appellant's Br*. at 4.

11

The facts most favorable to the verdict are that, hours after the robbery occurred, L.H. spoke to Officer Rauch and identified Davis as the person involved in the robbery. Later that day, Detective Green interviewed L.H., and she again identified Davis as one of two persons that beat, kicked, and robbed Taylor. *Tr.* at 107-08, 182-83. At trial, however, L.H. testified that not only did she not recall telling them that she witnessed the incident or that Davis was involved, she did not recall meeting with Detective Green or making a statement at the City-County Building that day at all. As L.H. testified at trial, she was subject to cross-examination concerning her out-of court statement, and the trial court was free to believe or disbelieve her testimony and assess her credibility.

During trial, the trial court also heard Taylor's testimony that, initially while he was stopped on his bicycle outside of Davis's house, there were two male juveniles and one female juvenile present, and the female walked away as the robbery took place. The lack of direct evidence that L.H. perceived the robbery goes to the weight of her identification, not its admissibility. The trial court properly admitted her statements under Evidence Rule 801(d)(1)(C). *See Kendall,* 790 N.E.2d at 127-28 (witness's prior statement to police identifying defendant as driver of car used in crime was admissible as substantive evidence under Evidence Rule 801(d)(1)(C) where witness recanted her prior identification statement at trial identifying defendant); *Robinson v. State,* 682 N.E.2d 806, 810 (Ind. Ct. App. 1997) (no error in allowing police detective to testify regarding witness's identification of defendant where witness testified at trial and recanted his prior identification statement and claimed that his prior statement to police was a fabrication).

## II.     Admission of Depositions

Davis next contends that the trial court abused its discretion when it determined that Dorothy and A.D. were unavailable and thereafter admitted their depositions into evidence at trial. Prior testimony is hearsay, but Indiana Rule of Evidence 804 provides a hearsay exception for the prior testimony of a declarant who is "unavailable" as a witness. *Berkman v. State*, 976 N.E.2d 68, 74 (Ind. Ct. App. 2012), *trans. denied*, *cert. denied*, 134 S. Ct. 155 (2013). Specifically, Indiana Rule of Evidence 804(b)(1)(A) provides that, where a declarant is unavailable as a witness, the hearsay rule does not exclude the declarant's former testimony which was given at a lawful deposition and is now offered against a party who had the opportunity to cross-examine it. A declarant is unavailable for purposes of this exception if the declarant is absent from trial and the State "has not been able, by process or other reasonable means, to procure[] the declarant's attendance." Ind. Evidence Rule 804(a)(5). As Davis recognizes in his brief, unavailability as witness includes situations in which the declarant persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so. *Appellant's Br.* at 8; Evid. R. 804(a)(2). "'The decision whether to invoke the rule allowing admission of prior recorded testimony is within the sound discretion of the trial court.'" *Berkman*, 976 N.E.2d at 74 (quoting *Johnston v. State*, 517 N.E.2d 397, 399 (Ind. 1988)).

Here, Davis claims that the trial court abused its discretion in declaring Dorothy and A.D. unavailable, suggesting that the State's efforts to bring Dorothy and A.D. to court were unreasonable because the State "waited until the day before trial to serve [them]." *Appellant's Br.* at 9. That position, however, fails to recognize the repeated efforts made

13

by the State throughout years of proceedings to bring both Dorothy and A.D. to court, most of which they ignored, avoided, or disobeyed. For instance, despite the fact that Dorothy was served with a subpoena in open court on April 16, 2013 and instructed by the trial judge at that time to appear, with A.D., at the May 23, 2013 trial date, both Dorothy and A.D. failed to appear on May 23. Eventually, Dorothy was found in contempt and was ordered to serve a community corrections sentence. The September 27, 2013 trial date was set on August 9, 2013; Davis appeared in person and by counsel at the September 27 trial; his mother and sister, however, did not. Deputy prosecutors attempted to serve Dorothy and A.D. at Dorothy's home on September 26, but the female inside the home, after inquiring who was at the door, refused to open or answer it. Detective Green testified to having attempted to serve subpoenas on Dorothy and A.D. on several occasions during the course of the proceedings, and he described their demeanor as "hostile." *Tr.* at 178. In the midst of the September 27 trial, the State requested and received bench warrants; although both vehicles registered to Dorothy were in the driveway, no one responded or opened the door. Considering the State's efforts to serve subpoenas before this trial and other prior trial dates, as well as attempts to serve bench warrants the day of trial, and their repeated and deliberate decision not to appear, the trial court did not abuse its discretion when it determined that Dorothy and A.D. had made themselves unavailable. *See Tiller v. State*, 896 N.E.2d 537, 543-45 (Ind. Ct. App. 2008) (affirming trial court's determination that reluctant witness who deliberately absented himself was unavailable where State had utilized various means to contact witness including phone calls, personal service of subpoena, and writ of body attachment).

14

### III.  Sufficiency of the Evidence

Davis next challenges his conviction on sufficiency grounds.  To convict Davis of Class A felony robbery resulting in serious bodily injury as charged here, the State was required to prove beyond a reasonable doubt that Davis "did knowingly take from the person or presence of Kevin Taylor property, that is : bicycle and/or shoes and/or money and/or alcohol, by putting Kevin Taylor in fear or by using or threatening the use of force on Kevin Taylor which resulted in serious bodily injury, that is: extreme pain and/or loss of consciousness and/or head injuries[.]" *Appellant's App*. at 52; Ind. Code § 35-42-5-1.

In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses.  *Hoover v. State*, 918 N.E.2d 724, 731 (Ind. Ct. App. 2009), *trans. denied*.  We will consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment.  *Id.*  A conviction may be based upon circumstantial evidence alone.  *Id.* Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense.  *Id.*

In this case, Davis contends that the State failed to prove that he was one of the two individuals who robbed and beat Taylor.  Specifically, Davis argues that without L.H.'s statement to police identifying Davis, which he argued should not have been admitted, the only other direct evidence tying Davis to the robbery is "the unreliable testimony of jailhouse informant, Rashaun Barnes[.]" *Appellant's Br*. at 10.   Davis also argues that without the depositions of A.D. and Dorothy, the photographs taken of the scene by A.D.

15

of the grass and sidewalk and mop, would not have been admissible. He continues with the contention that, without all of that evidence, the circumstantial evidence linking Davis to the crime is tenuous, noting, for instance, that there was no blood on Davis's clothing, nor did police find money or marijuana on Davis or in his home when he was arrested and the house was searched. We reject his claim that the evidence was insufficient, as there was considerable direct and circumstantial evidence linking Davis to the robbery and beating of Taylor.

As we have explained, L.H.'s statements to police identifying Davis as participating in the beating and robbery were properly admitted. Furthermore, although Taylor could not identify Davis in a photographic array shown to him while he was sedated at the hospital, Taylor did make an in-court identification of Davis as the person who started the robbery by grabbing Taylor's pocket and preventing him from pedaling away. This was consistent with the testimony of Barnes who said that Davis's explanation for being incarcerated was that he had hit a man with a brick during the course of an attempted sale of marijuana and that he had instructed "Tajh-E" to go through the man's pockets. *Tr*. at 86-92. Next, contrary to Davis's assertion, there was blood found on Davis's clothes, namely drips of blood on the tops of his shoes, and DNA testing revealed that the blood on Davis's shoes matched that of Taylor. As the State notes, the blood was on the top surface of the shoes, consistent with an inference that blood dripped on them, not on the bottom of his shoes, which might have been consistent with Davis's suggested inference that he walked through blood at the scene after it happened. We have also found that the depositions of Dorothy and A.D. were properly admitted, as they made themselves

16

unavailable. In her deposition, A.D. acknowledged taking pictures of the scene, namely blood on the sidewalk and grass, and the stained mop on the outside steps of the porch, and sharing those pictures with police. Taylor testified to being hit in the back of the head with something very hard, which knocked him to the ground, and the forensics testing also revealed that a brick found by a tree at Davis's residence contained a DNA mixture that included Taylor's DNA. On the same day as the robbery, Davis was connected with two items stolen from Taylor, his blue and silver bicycle that was outside the restaurant where Davis was apprehended, and Taylor's shoes, which were in Davis's yard. Also stolen from Taylor was a bottle of Seagram's gin that he had just purchased; Dorothy told police that she found Davis with a bottle of gin, which she took from him and emptied. During their search of her property, police recovered a bottle of Seagram's gin from Dorothy's trash. We find that there is sufficient evidence to sustain Davis's conviction.

Affirmed.

MAY, J., and BAILEY, J., concur.