## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 23 2018, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony James Hood,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 23, 2018

Court of Appeals Case No.
45A04-1709-CR-2255

Appeal from the Lake Superior Court

The Honorable Clarence D. Murray, Judge

Trial Court Cause No.
45G02-1305-MR-6

**Pyle, Judge.**

# Statement of the Case

Anthony Hood ("Hood") appeals his conviction by jury of Class A felony voluntary manslaughter.[1]  He argues that the trial court abused its discretion when it:  (1) concluded that two witnesses were unavailable and admitted their deposition testimony into evidence; (2) admitted hearsay testimony; and (3) denied his motion to correct error.  Finding no abuse of the trial court's discretion, we affirm Hood's voluntary manslaughter conviction.

We affirm.

# Issues

1.  Whether the trial court abused its discretion when it concluded that two witnesses were unavailable and admitted their deposition testimony into evidence.

2.  Whether the trial court abused its discretion when it admitted hearsay testimony.

3.  Whether the trial court abused its discretion when it denied Hood's motion to correct error.

---

[1] IND. CODE § 35-42-1-3.  We note that effective July 1, 2014, this statute was amended and Hood's offense would now be considered a Level 2 felony.  However, we will apply the version of the statute in effect at the time of the offense.

## Facts

[3] One night in December 2012, seventeen-year-old Hood and Jaqueline Kennedy ("Kennedy") walked around together in a Gary neighborhood looking for someone to rob because it was Kennedy's birthday and she "was trying to get some money." (Tr. Vol. 2 at 111). Hood was armed with a .9 millimeter handgun, and Kennedy was armed with a .45 semi-automatic handgun. At some point, they approached Richard Taylor ("Taylor"), who was standing outside a neighborhood convenience store. When Kennedy pointed her gun at Taylor, he ran to a nearby parking lot. Hood and Kennedy pursued Taylor, knocked him to the ground, and kicked and hit him. Hood then shot Taylor three times and ran. Hood hid his gun near an abandoned house in the neighborhood. Kennedy also ran from the scene and disposed of her gun. Taylor died as a result of his injuries.

[4] The following afternoon, Hood and Kennedy met to look for their guns. Allen Evens ("Evens") saw Hood and Kennedy searching for something in a field and reported what he had seen to the police. Police officers interviewed Kennedy, who eventually told them that Hood had killed Taylor. She also told the officers that Hood had sold the .9 mm murder weapon to Alvin Jones ("Jones"). Police officers went to Jones' house and found a .9 mm handgun. The State charged Hood with murder.

[5] Jones and Evens were both deposed in early 2014, and were both subject to cross-examination by Hood's attorney. In May 2016, the State filed motions to declare both Jones and Evens unavailable so that their depositions could be

admitted at trial. The motion to declare Jones unavailable provided that the State had served Jones at his last known address. In addition, the State had attempted to identify a new address through BMV records and other information systems. A Gary Police Department detective had also gone to several of Jones' previous residences and had spoken with possible associates of Jones in an attempt to locate him. The motion to declare Evens unavailable provided that the State had attempted to locate him by serving him at his last known address. The State had also attempted to identify a new address through certified BMV records and had attempted to serve Evens at that address as well. Investigators had also spoken with Evens' neighbors, who told the investigators that they believed that Evens had left Lake County. At trial, the State explained that it had tried to served Evens "as late as Monday." (Tr. Vol. 3 at 102). The trial court concluded that both Evens and Jones were unavailable and admitted their depositions into evidence at trial over Hood's objection.

[6] Also at trial, Gary Police Department Homicide Detective James Nielsen ("Detective Nielsen") testified that he was dispatched to the scene following the shooting. He explained that he "surveyed the scene and [] knocked on several doors and did what's called a canvas." (Tr. Vol. 3 at 237). Detective Nielsen further testified that during the canvas, he spoke with a neighborhood resident who told him that she had been inside her house when she had heard three gunshots. Hood objected that the testimony was hearsay, and the State responded that it was a "non-hearsay exception, it's offered for the [e]ffect on the listener during the course of his investigation." (Tr. Vol. 3 at 238). The trial

court overruled Hood's objection, and the State asked the detective what he had done next. Detective Nielsen responded that he had "continued to look at the scene and tried to locate any spent shell casings." (Tr. Vol. 3 at 239).

[7] Detective Nielsen also testified that another police officer had returned to the scene and had told him that his dog had tracked two tracks from the area. Following another hearsay objection, the State again responded that it was a "non-hearsay exception during the course of the investigation." (Tr. Vol. 3 at 242). The trial court overruled the objection, and the State asked the detective what he had done next. The detective responded that he had instructed the crime lab to take photographs of different areas.

[8] In addition, the detective testified that, a few days after the shooting, another detective had telephoned and had advised him that there was an individual at the police station that had some information about the case. Following a hearsay objection, the State again responded that it was a "non-hearsay exception, [e]ffect on the listener, pursuant to his investigation." (Tr. Vol. 3 at 248). The trial court again overruled Hood's objection, and the State asked the detective what he had done next. Detective Nielsen responded that he had gone to speak with the individual.

[9] Detective Nielsen further testified that he had taken a statement from Kennedy and she had "said that the name of Little Tony was, in fact, Anthony Hood." (Tr. Vol. 4 at 3-4). Hood objected on the basis of hearsay, and the State responded that it was a "non-hearsay exception as to the effect on [the] listener

during the course of Detective Nielsen's investigation." (Tr. Vol. 4 at 3). The trial court overruled Hood's objection, and the State asked the detective if he had followed up on the information provided by Kennedy, and the detective responded that he had.

[10] Lastly, Detective Neilson testified without objection that Kennedy had told the detective that Hood had sold the murder weapon to Jones. The State asked the detective if he had continued his investigation with this information, and Detective Nielsen responded that he had gone to Jones' house to look for the gun. When the detective arrived at Jones' house, Jones told him that he had bought the gun from Hood and that it was in his bedroom. Detective Nielsen located the gun, and photos of it were admitted into evidence without objection. The State asked Detective Nielsen what he had done with the investigation after finding the gun, and the detective responded that he had taken a statement from Jones at the police department. When the State asked Detective Nielsen what information Jones had provided, Hood objected on the basis of hearsay. The State responded that it was a "non-hearsay exception, during the course of his investigation, effect on listener," and the trial court overruled the objection. (Tr. Vol. 4 at 11). However, Detective Nielsen did not have the opportunity to respond to the question.

[11] Because of the number of hearsay objections, the trial court took a recess. Following the recess, and before the jury entered the courtroom, the following colloquy ensued:

Trial Court:  We're back on the record.  The jury is still out.  We have an issue with respect to the hearsay objection.  It's been interposed a number of times during the testimony of Detective Nielsen, who has testified as to what some other individuals told him in furtherance of his investigation.  And I thought it prudent to have the State cite the exact exception to this rule.  I've [overruled] a number of these objections, but I want the record to be preserved as to exactly what exception the State is relying on in the event that this case goes before a higher court at some point.

State:  Yes, your Honor.  The rule that the State is using in regards to Detective Nielsen's testimony about what other individuals told him is Rule 801(c)(2).  The statements provided to Detective Nielsen by other individuals are not being offered to prove the truth of the matter asserted or the truth of the statement.  So whatever statement is elicited by Detective Nielsen, we're offering them for what that information did for Detective Nielsen, and how he used that information in furtherance of his investigation.

Trial Court:  [Defense Counsel]?

Defense Counsel:   I've got nothing else to add other than the continuing objection to that.

Trial Court:  All right.  We've made a careful record then on this issue.  I think we can move on now.

(Tr. Vol. 4 at 13-14).

[12]     Also at trial, Kennedy testified that:  (1) she had also been charged with Taylor's murder; (2) she had an agreement with the State that she would receive a benefit in exchange for her testimony; (3) she did not know what that benefit would be; (4) the State had not yet offered her a written or finalized plea agreement; (5) she did not know what was going to happen to her; and (6) she

had signed a proffer statement ("the Proffer"), which was admitted into evidence. The Proffer provided that Kennedy would provide a detailed statement about the crime and testify at Hood's trial. According to the Proffer, the State would not enter into a plea agreement until it was satisfied with the "sufficiency of [Kennedy's] proffer," and any plea agreement would be null and void if Kennedy failed to cooperate. (State's Ex. 41). The Proffer further provided that the State would determine the value of Kennedy's cooperation and the consideration to be given in return for this cooperation and that no other promises, agreements, or other understandings existed between Kennedy and the State.

[13] During direct examination, Kennedy admitted that she had taken part in Taylor's murder. She also testified that Detective Nielsen had told her that she would be charged with murder and that he had explained to her the penalties for murder. According to Kennedy, despite the charges and penalties for murder, she had talked to Detective Nielsen because she "thought [she] was doing the right thing." (Tr. Vol. 2 at 112). During cross-examination, defense counsel asked Kennedy what Detective Nielsen had told her that the penalties for murder were. The trial court told Kennedy not to answer the question, and during a bench conference, the trial court told defense counsel that the jury was "not allowed to hear the penalties . . . because they're instructed not to consider the penalties while deliberating." (Tr. Vol. 2 at 114). During cross-examination, the trial court allowed defense counsel to ask Kennedy whether

she understood that murder was the most serious offense in the criminal code and had the most serious penalty.

[14] The jury convicted Hood of voluntary manslaughter, and the trial court sentenced him to forty (40) years with five (5) years suspended. Following his conviction and sentencing, Hood filed a motion to correct error, requesting a new trial based upon the State allegedly violating its obligation to disclose to the defense any benefits offered to Kennedy for her cooperation. Specifically, in his motion to correct error, Hood alleged that "the prosecution [had] misled the Court and the jury as to the benefits it had extended and/or was prepared to extend to Kennedy for her testimony." (App. Vol. 2 at 185).

[15] In support of his motion, Hood attached an affidavit from Kennedy's trial counsel who averred that: (1) in April or May 2016, the State made "suggestions . . . that Kennedy would enter a plea to a [Class] B felony and would be credited with time served followed by a period of probation[;]" (2) in May 2016, the State appeared at a bench conference and "suggested that a plea was in the works, [but] the details had not be approved" by the chief prosecutor; (3) after Hood's May 2017 trial, the State "suggested that [Kennedy] would receive credit for time served followed by a period of five (5) years' probation upon her plea to some lesser, amended B Felony[;]" (4) a few days later, the State "reversed itself and advised that supervisors within the prosecutor's office suggested that [Kennedy] enter a plea to the same charge as Defendant Hood with the same penalty as received by Hood[;]" (5) shortly thereafter, the State agreed to allow Kennedy to plead guilty to attempted robbery resulting in

bodily injury; and (6) Kennedy was sentenced to six years with credit for 1,185 days of confinement with the balance on probation. (App. Vol. 2 at 190-91). Kennedy's counsel also averred in the affidavit that "[a]t no time prior to the trial of Anthony Hood was [Kennedy] ever informed of the specific terms of any plea agreement nor was she ever advised of the precise sentence she would receive." (App. Vol. 2 at 191).

[16] At the hearing on Hood's motion to correct error, the State responded to Hood's allegations as follows:

> The defense is claiming that the State ha[d] some kind of secret deal with [Kennedy's counsel]. Other than stating that we did not, how do you prove it? Well, I'd ask the Court if you look at – it's [a] bulleted Personal Attack. I think attack is a strong word, but a personal criticism, as well as, a professional one. So you have to look at, uh, my record, personally, in this court. Professionally. . . I've practiced in this court for 13 years. I've had no disciplinary, uh, complaints or write-ups. I think if you ask [Hood's counsel] if he believes that this is something I would engage in, he would personally tell you no.

(Tr. Vol. 7 at 9, 10).

[17] After further discussing the allegations with both the State and Hood's counsel, the trial court stated as follows:

> The parties are getting close to impugning each other's reputations here. And I don't like that. The attorneys involved in this case are all veteran attorneys and, uh, their reputations are beyond reproach, as far as, I'm concerned. . . It's the defense position that there was an offer in place, and that defense should

have been allowed to inquire as to this, this, this offer. The State said there was no understanding as to an offer, and Ms. Kennedy testified that she had not been offered anything. I think the inquiry, necessarily has to stop there unless there's some further evidence.

(Tr. Vol. 7 at 14, 16). Neither party submitted any additional evidence, and the trial court denied Hood's motion to correct error. Hood now appeals his conviction as well as the denial of his motion to correct error.

# Decision

### 1. Unavailable Witnesses

[18] Hood first argues that the trial court abused its discretion when it determined that Evens and Jones were unavailable witnesses and admitted their deposition testimony into evidence at trial. Specifically, he contends that the State did not take "reasonable efforts to secure the attendance of the allegedly unavailable witnesses" Evens and Jones. (Hood's Br. 26).

[19] "The decision whether to invoke the rule allowing admission of prior recorded testimony is within the sound discretion of the trial court." *Berkman v. State*, 976 N.E.2d 68, 74 (Ind. Ct. App. 2012), *trans. denied, cert. denied*. "Prior testimony is hearsay, but Indiana Rule of Evidence 804 provides a hearsay exception for the prior testimony of a declarant who is 'unavailable' as a witness." *Davis v. State*, 13 N.E.3d 939, 945 (Ind. Ct. App. 2014), *trans. denied*. Specifically, Indiana Rule of Evidence 804(b)(1)(A) provides that, where a declarant is unavailable as a witness, the hearsay rule does not exclude the

declarant's former testimony, which was given at a lawful deposition and is now offered against a party who had the opportunity to cross-examine it. *Id.* at 945-46. A witness is not unavailable unless prosecutorial authorities make a good-faith effort to secure his presence at trial. *Bartruff v. State*, 528 N.E.2d 110, 113 (Ind. Ct. App. 1988), *trans. denied*. The extent to which the prosecution must go to produce a witness is a question of reasonableness. *Id.*

[20] For example, in *Berkman,* 976 N.E.2d at 68, the State offered into evidence the deposition testimony of Paul Barraza. The State explained that it had given Barraza's address and telephone number to an investigator, who had been unable to serve Barraza with a subpoena just one month before trial. The State, which had also been unable to contact Barraza by telephone, explained that it believed that Barraza was in Florida avoiding an arrest warrant. The trial court admitted Barraza's deposition into evidence, and after Berkman was convicted, he appealed. Specifically, Berkman argued that the State had failed to adequately show that Barraza had been unavailable. However, this Court concluded that where the State had subpoenaed Barraza at his last known address one month before trial and had given Barraza's last known address to its investigator, the State had made a reasonable good-faith effort to secure Barraza's presence at trial. *Id.* at 76. We further noted that whether the State could have secured Barraza had it put forth considerably more effort was speculative at best, and we could not say that the State's failure to send an investigator to Florida was unreasonable where the record did not reflect that the State had a possible address for Barraza in Florida. *Id.* at 77. Thus, under

the circumstances, we concluded that we could not say that the State had been required to do more than it did to secured Barraza's presence at trial.

[21] The facts before us are similar to those in *Berkman*. Regarding Jones, the State served him at his last known address. The State also attempted to identify a new address through BMV records and other information systems. In addition, a Gary Police Department detective went to several of Jones' previous residences and spoke with possible associates of Jones in an attempt to locate him. Regarding Evens, the State also served him at his last known address, as well as at another address found on his official driving record. Investigators also spoke with Evens' neighbors, who believed that Evens had left Lake County. Additionally, the State had attempted to serve Jones as late as the week of trial. Based on these circumstances, here, as in *Berkman*, we conclude that the State made a reasonable good-faith effort to secure the presence of both Jones and Evens at trial. Accordingly, the trial court did not abuse its discretion in admitting the deposition testimony of both Jones and Evens into evidence at trial.

### 2. Hearsay Testimony

[22] Hood also argues that the trial court abused its discretion in allowing Detective Nielsen to testify that: (1) a witness told him that she had been inside her house when she had heard three gunshots; (2) another police officer had told him that his dog had tracked two tracks from the area; (3) another detective had telephoned and advised him that there was an individual at the police station

that had some information about the case; and (4) Kennedy had told him that the name of Little Tony was Anthony Hood. Specifically, Hood argues that "[a]ll the information solicited by the Detective were out-of-court statements offered for the truth and should have been excluded." (Hood's Br. 32).[2] The State responds that the "record shows that the portions of Detective Nielsen's testimony of which [Hood] complains [were] offered to show the sequence and reasons for actions he took in investigating the crime, and not for the truth of the matter in the declarant's statements." (State's Br. 37). We agree with the State.

[23] The decision to admit or exclude evidence at trial is within the trial court's discretion, and we afford it great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We review the trial court's decision regarding the admissibility of evidence for an abuse of discretion. *King v. State*, 985 N.E.2d 755, 757 (Ind. Ct. App. 2013), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

---

[2] Hood also challenges the admission of Detective Nielsen's testimony that Jones told him that he had bought a .9 millimeter handgun from Hood. However, our review of this testimony reveals that Hood failed to object to Detective Nielsen's testimony the first time that the detective mentioned that Jones had told him that he had bought a handgun from Hood. Rather, Hood did not object to this testimony until the State later asked the detective what Jones had told him. "Reversal may not be predicated upon the erroneous admission of evidence when evidence having the same probative effect is admitted without objection or without contradiction." *Rinard v. State*, 265 Ind. 56, 62, 351 N.E.2d 20, 24 (1976).

[24] Hearsay is an out-of-court statement that is "offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c)(2). Hearsay is generally not admissible at trial. *See* Ind. Evid. Rule 802. "'Whether a statement is hearsay . . . will most often hinge upon the purpose for which it is offered.'" *Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) (quoting *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998)). Out-of-court statements made to law enforcement officers are not hearsay if introduced primarily to explain why the investigation proceeded as it did. *Blount*, 22 N.E.3d at 565. Course-of-investigation testimony is excluded from hearsay only for the limited purpose of bridging gaps in the trial testimony that would otherwise substantially confuse or mislead the jury. *Id.*

> For this reason, we must pay careful attention to the purpose for which an out-of-court statement is offered. The ultimate inquiry is: Was the out-of-court statement used primarily to show the truth of its content, constituting inadmissible hearsay, or merely to explain subsequent police action, excluded from hearsay?

*Id.* at 566. To answer this question, we turn to the following three-part test articulated in *Craig v. State*, 630 N.E.2d 207 (Ind. 1994): (1) does the testimony describe an out-of-court statement asserting a fact susceptible of being true or false; (2) what is the evidentiary purpose of the proffered statement; and (3) is the fact to be proved relevant to some issue in the case, and does any danger of prejudice outweigh its probative value. *Id.* at 566-67.

[25] Here, our review of the evidence reveals that all of the challenged testimony described out-of-court statements asserting a fact susceptible of being true or

false and that the evidentiary purpose of the proffered statements was to show the sequence and reasons for the steps Detective Nielsen took in investigating Taylor's murder. In addition, where Detective Nielsen testified how each statement had led him to the next step in his investigation, we see no danger of prejudice. Accordingly, the trial court did not err in admitting Detective Nielsen's testimony.[3]

### 3.  Motion to Correct Error

Lastly, Hood argues that the trial court erred in denying his motion to correct error pursuant to Indiana Trial Rule 59. Our standard of review in such cases is well-established. We review a trial court's ruling on a motion to correct error for an abuse of discretion. *Old Utica School Preservation, Inc. v. Utica Tp.*, 7 N.E.3d 327, 330 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs when the trial court's decision is contrary to the logic and effect of the facts and circumstances before it or the reasonable inferences therefrom. *Id.*

Here, the gravamen of Hood's argument is that the trial court should have granted his motion to correct error and given him a new trial because the State engaged in misconduct. Specifically, Hood contends that it "cannot be mere coincidence that the same terms recited by [the State] prior to trial ended up

---

[3] Hood also asserts that the admission of the deposition testimony and course-of-the-investigation hearsay testimony violated his confrontation rights under Article I, Section 13 of the Indiana Constitution. However, other than a cursory mention of the Indiana provision, Hood does not further develop this argument and, therefore, has waived it. *See Wallace v. State*, 79 N.E.3d 992, 1000 n.1 (Ind. Ct. App. 2017).

being virtually the same plea and sentence to which Kennedy ultimately entered." (Hood's Br. 20-21).

[28] However, our review of Kennedy's attorney's affidavit and the evidence presented at the motion to correct error hearing reveal that they do not support Hood's argument. First, Kennedy's attorney's affidavit provides that one year before Hood's trial, the State had made "suggestions" that Kennedy would plead guilty to a Class B felony and be credited with time served followed by probation. (App. Vol. 2 at 190). A suggestion is not a firm offer as evidenced by the fact that the following year, supervisors in the prosecutor's office "suggested" that Kennedy enter a plea to the same Class A felony charge as Hood with the same penalty. (App. Vol. 2 at 191). Thereafter, the State apparently: (1) concluded that Kennedy had complied with the Proffer; and (2) "determine[d] the value of Kennedy's cooperation and the consideration to be given in return" was a guilty plea to a Class B felony with a six-year sentence with credit for time served and the balance on probation. (State's Ex. 41). Kennedy's attorney's affidavit does not support Hood's allegation that the State engaged in misconduct, and neither does the evidence presented at the motion to correct error hearing. Specifically, after hearing evidence, the trial court pointed out that the attorneys involved in the case were veteran attorneys with reputations beyond reproach. The trial court also pointed out that although the defense alleged that there had been an offer in place since a year before the trial had begun, the State responded that there had been no understanding as to an offer at the time of Hood's trial. Further, Kennedy testified that the State had

not offered her anything. There is no evidence to support Hood's claim that the State engaged in misconduct. Without such evidence, the trial court did not abuse its discretion in denying Hood's motion to correct error.

[29] Affirmed.

Kirsch, J., and Bailey, J., concur.