## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 23 2018, 8:56 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of J.W., a Child in Need of Services (CHINS);

M.W. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services, et al.,

*Appellee-Petitioner.*

August 23, 2018

Court of Appeals Case No. 18A-JC-432

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Rosanne Ang, Magistrate

Trial Court Cause No. 49D09-1709-JC-2969

**Pyle, Judge.**

## Statement of the Case

Appellant, M.W. ("Mother") appeals the adjudication of her child, J.W. ("J.W."), as a Child In Need of Services ("CHINS"). Concluding that there is sufficient evidence to support the trial court's adjudication of J.W. as a CHINS, we affirm the trial court's judgment.

We affirm.

## Issue

Whether there is sufficient evidence to support the trial court's adjudication of J.W. as a CHINS.

## Facts

Mother and J.W.'s alleged father C.K. ("Alleged Father")[1] became involved with the Indiana Department of Child Services ("DCS") in September 2017 when J.W. was fifteen years old. From the time J.W. was in kindergarten until about the age of twelve, he had lived with his maternal grandparents "almost full time." (Tr. 33). Mother had also lived with maternal grandparents "off and on" when J.W. was there, but it was "more off than on." (Tr. 33). Sometime in 2014, when Mother obtained an apartment of her own, J.W. began living with Mother.

---

[1] Alleged Father is not a party to this appeal.

[4] Around September 2017, DCS received a report that Mother had abandoned and neglected J.W., that she was "moving around from place to place," and that J.W. had been living with a family friend ("Family Friend") for "quite a while." (Tr. 9, 12). DCS Assessment Worker James Oliver ("Assessment Worker Oliver") met with J.W. on multiple occasions during his assessment but was unable to reach Mother despite several attempts. His efforts to reach Mother included referring the matter to a private investigator, leaving voicemail messages and sending text messages to the telephone number Family Friend and J.W. had for Mother, and tracking down "a couple of addresses and a couple of phone numbers, all of [which] weren't working." (Tr. 11). Following Assessment Worker Oliver's initial assessment, DCS filed a CHINS petition (the "Petition") alleging that J.W. was a CHINS due to Mother's abandonment and neglect. J.W. also received a referral for home-based therapy. During the pendency of the CHINS proceeding, J.W. ran away from his placement with Family Friend, spent one evening in Emergency Shelter Care, and then spent one week in foster care before running away again.

[5] On January 9, 2018, the trial court held a fact-finding hearing on the Petition. At the time of the hearing, J.W.'s whereabouts were still unknown. Mother failed to appear but was represented by counsel. The trial court heard testimony from five witnesses: (1) Assessment Worker Oliver; (2) home-based case manager Crystal Rose ("Case Manager Rose"); (3) home-based therapist Laura Beer ("Therapist Beer"); (4) J.W.'s maternal grandmother E.W.

("Maternal Grandmother"); and (5) Family Case Manager Brittany Simmons ("Case Manager Simmons").

[6] First, Assessment Worker Oliver testified about his initial assessment and multiple meetings with J.W., his several unsuccessful attempts to reach Mother, J.W.'s placement with Family Friend, and DCS's filing of the Petition. Next, Case Manager Rose testified about her involvement as the home-based case manager assigned to J.W.'s case. She testified that, as of the date of the hearing, she had never met with Mother. She testified that the two had been scheduled to meet the week before the hearing, but Mother was a "no call / no show" and had texted two hours later that she "was sick." (Tr. 17). Case Manager Rose also testified that DCS had referred her to Mother "to help assist with housing," (Tr. 19), but that the two had not yet completed an initial assessment.

[7] Therapist Beer testified that she completed an intake with J.W. and then had two therapeutic appointments with him in October 2017. She also testified that during their second session, J.W. had told her that "he has a lot of mistrust towards his mother because of the treatment he had as a child not being cared for," and that this mistrust "made it difficult for him to open up to others and to trust others." (Tr. 28). She further testified, over a hearsay objection by Mother's counsel, that J.W. had told her that Mother would often be locked away in her room, leaving J.W. to fend for himself. She then opined that Mother's conduct had "seeded his mistrust." (Tr. 29). Therapist Beer further testified that she had to discharge J.W. because his foster placement was

outside of her service area but that she recommended continued therapy for him.

[8] Maternal Grandmother testified that she had been J.W.'s primary caregiver from the time he was in kindergarten until Mother had obtained public housing approximately three years ago. She testified that Mother had had "problems controlling [J.W.'s] behavior" when he had lived with Mother in public housing and that J.W. had not been "coming home at night[.]" (Tr. 34). She also testified that Mother "has absolutely no idea how to parent a teenager" and that J.W. "would need help because his mother ha[d] not been there for him and ha[d] left him and that this point he's [a] very angry child who has little or no respect for . . . any kind of authority." (Tr. 34-35). She also testified that shortly after J.W. ran away from foster care, he had appeared at her home with all of his belongings. She testified that she had refused to let him move back in, but she had allowed him to leave his belongings. Maternal Grandmother further testified that she had not seen J.W. since her husband took him to school that day.

[9] Finally, Case Manager Simmons provided testimony about DCS's involvement in the matter since September 2017, when she was assigned the case after Assessment Worker Oliver completed his initial assessment. Case Manager Simmons testified that at the time she received the case, J.W. was in "kinship care" with Family Friend. (Tr. 40). She testified that Mother's whereabouts were unknown at the time and that Alleged Father's whereabouts were also unknown. She further testified that J.W. was initially placed with Family

Friend and then spent one night in an emergency shelter while DCS tried to locate a foster placement for him. She testified that J.W. was subsequently placed in foster care "for about a week" before running away and that she had provided law enforcement a "runaway packet" with J.W.'s picture and last known location. (Tr. 41, 49). She also testified that law enforcement had issued a warrant for J.W.'s detention. Finally, she testified that DCS's plan was reunification by assisting Mother with therapy, housing, and other services to "ultimately help her get into a better place." (Tr. 45).

[10] That day, the trial court issued its order adjudicating J.W. to be a CHINS. On February 20, 2018, the trial court held a disposition hearing and issued another order (the "Participation Order") requiring Mother to: (1) undergo a parenting assessment and to successfully complete all resulting recommendations, such as parenting classes, home-based counseling services, or other counseling services; (2) participate in home-based therapy to be referred by DCS and follow all resulting recommendations; and (3) participate in family therapy with J.W. and follow all resulting recommendations. Mother now appeals.

# Decision

[11] Mother argues that DCS presented insufficient evidence to support the trial court's determination that J.W. is a CHINS. DCS bears the burden of proving by a preponderance of the evidence that a child is a CHINS. *See* IND. CODE § 31-34-12-3; *In re. M.W.*, 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). When determining whether sufficient evidence exists in support of a CHINS determination, we consider only the evidence favorable to the judgment and the

reasonable inferences raised by that evidence. *In re M.W.*, 869 N.E.2d at 1270. This Court will not reweigh the evidence or judge witnesses' credibility. *Id*. Where a trial court enters specific findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty Office of Family & Children*, 830 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we examine whether the findings support the judgment. *Id*. We will set aside the trial court's judgment only if it is clearly erroneous. *Id*.

[12] In its Petition, DCS alleged that J.W. is a CHINS pursuant to INDIANA CODE § 31-34-1-1, which provides:

> A child is in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[13] Within its order adjudicating J.W. as a CHINS, the trial court issued specific findings, including that:

> 10. [Mother] has not consistently cared for [J.W.] in the past. When [J.W.] did reside with [Mother], she ha[d] issues with parenting him. Additionally [Mother] would often lock herself in her room, leaving

[J.W.] to fend for himself. [J.W.] has issues of mistrust of his mother due to this neglect.

11. [Mother] needs assistance locating appropriate housing for herself and [J.W.] as she lives with a family member in a home that does not have sufficient space for [J.W.].

12. Crystal Rose was referred to provide homebased case management services to [Mother]. Ms. Rose has been unable to meet with [Mother] to do the intake appointment in order to begin assisting [M]other with issues pertaining to housing, employment and any other identified case management need.

13. Laura Beer is a homebased therapist who was assigned to work with J.W. in October of 2017. Ms. Beer was able to meet with J.W. for an intake appointment and two subsequent therapy appointments. J.W. did not complete therapy with Ms. Beer. Ms. Beer believes that J.W. still has therapeutic needs.

14. During the pendency of this cause of action, J.W. ran away from placement with [Faimily Friend], spent one evening in Emergency Shelter Care, and only one week in foster care before running away again. The whereabouts of J.W. are currently unknown and the DCS is currently attempting to locate him.

15. . . . [Mother] has not provided [J.W.] with consistent care in the past and is not currently in a position to provide for his basic needs. Additionally, [Mother's] history of parental deficiencies has created mistrust on the part of [J.W.], which is best addressed prior to him returning to her care. [Alleged Father] is incarcerated and unable to care for [J.W.] at this time.

16. . . . [J.W.] is in need of stability while [Mother] works toward obtaining a stable home that is appropriate for the family and demonstrates that she is able to provide consistent, appropriate care. [J.W.] and [Mother] are in need of family therapy to address the issues which have been created by [Mother's] past parenting o[r] lack thereof.

(App. Vol. 2 at 104-05).

[14] On appeal, Mother does not challenge any of the above specific findings, and therefore those findings stand as correct. *McMaster v. McMaster*, 681 N.E.2d

744, 747 (Ind. Ct. App. 1997) (explaining that unchallenged trial court findings are accepted as true). Rather, Mother challenges only whether the trial court's findings are sufficient to support two of its judgments: (1) that J.W.'s physical or mental condition was seriously impaired or endangered as a result of Mother's neglect, refusal, or inability to supply food, clothing, shelter, medical care, education or supervision; and (2) that J.W. needed care or services he was not receiving and which were unlikely to be provided absent the court's coercive intervention. She further contends that because J.W.'s location is unknown, the trial court's orders are "largely moot," and she suggests that the CHINS matter should be dismissed "at least until such time as [J.W.] is located." (Mother's Br. 23, 25). We disagree.

[15]   Mother first challenges whether the trial court's findings support a conclusion that J.W.'s physical or mental condition was seriously impaired or endangered as a result of Mother's neglect, refusal, or inability to supply food, clothing, shelter, medical care, education or supervision. In her brief, she admits that "there is no question that J.W. may be 'seriously endangered' after having run away" but argues that J.W.'s status was not due to any "act or omission on the part of Mother alleged in the Petition." (Mother's Br. 23). Mother apparently misapprehends the unchallenged findings, which include specific findings bearing on both the abandonment and neglect allegations in the Petition and the trial court's conclusion that J.W.'s physical or mental condition was seriously impaired or endangered. Specifically, the trial court found that Mother had not provided consistent care, housing, or supervision for J.W. in

the past, that she was not presently able to provide those basic needs, and that her history of parental deficiencies had caused emotional harm to J.W. such that his mistrust of her needed to be addressed prior to reunification.[2] These unchallenged findings support the trial court's conclusion that J.W.'s physical or mental condition was seriously impaired or endangered because Mother had neglected, refused, or was unable to provide shelter and supervision to J.W. Accordingly, we find no error.

[16] Next, Mother challenges whether the evidence supports the conclusion that J.W. needed care, treatment, or rehabilitation he was not receiving and would be unlikely to receive absent the court's intervention. In doing so, Mother makes the same arguments addressed above, which fail for the same reason: the unchallenged findings support the trial court's conclusion that J.W. was not receiving care, supervision, or shelter from Mother. Regarding the need for the court's coercive intervention, a trial court necessarily considers a parent's "past, present, and future ability to provide sufficient care" during a CHINS

---

[2] Although Mother does not challenge any of the court's specific findings, in her brief Mother argues, without elaboration or citation, that "no qualification or foundation was made to establish that [J.W.'s statements to Therapist Beer] were admissible under any applicable hearsay exception" and that "it was error for the juvenile court to admit the statements attributed to J.W. by Ms. Beer." (Mother's Br. 23). We find this argument neither cogent nor developed, and therefore Mother has waived it. *Wallace v. State*, 79 N.E.3d 992, 1000 (Ind. Ct. App. 2017); *see also* Ind. Appellate Rule 46(A)(8)(a) (requiring that each contention be supported by cogent reasoning and supporting citations to legal authority). Waiver notwithstanding, Mother is incorrect in her assertion that no foundation was laid for admitting the hearsay exception. DCS laid a foundation for admitting the evidence pursuant to Indiana Evidence Rule 803(4), a statement made for medical diagnosis or treatment. Specifically, DCS provided evidence that Therapist Beer had explained "the therapy process and what therapy would be used for" (Tr. 25) and that J.W. was of an age that he could understand that the information he told her would be used in a therapeutic capacity. Accordingly, we find no error.

adjudication. *Matter of J.L.V. Jr.*, 667 N.E.2d 186, 190-191 (Ind. Ct. App. 1996); *see also In re D.J. v. Indiana Dep't of Child Services*, 68 N.E.3d 574 (Ind. 2017) ("When determining CHINS status under Section 31-34-1-1, particularly the 'coercive intervention' element, courts should consider the family's condition not just when the case was filed, but also when it is heard."). Here, the trial court's specific findings demonstrate Mother's long history of parental deficiencies, her present inability to provide for J.W.'s basic needs, and her failure to engage in any services offered to her by DCS that would allow the trial court to predict she would cooperate with DCS without the court's intervention. *Cf. id.* at 581 (explaining that parents did not need coercive intervention by the time of the fact-finding hearing because they "had completed the parenting curriculum . . . were very open and willing, had engaged in services, and were serious about doing what the court . . . asked them to do.") (internal quotation marks omitted). Therefore, the trial court's conclusion is not clearly erroneous.

[17] Finally, Mother argues for the first time in her reply brief that the trial court's CHINS adjudication should have been pursuant to INDIANA CODE § 31-34-1-8, rather than § 31-34-1-1, because J.W. was a "missing child" as contemplated by that provision. We find that argument waived. *See Monroe Guar. Ins. Co. v. Magwersk Corp.*, 829 N.E.2d 968 (Ind. 2005) ("The law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived."); *see also* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief.").

Waiver notwithstanding, her argument still fails because the sections of INDIANA CODE § 31-34-1-1, et seq., are not mutually exclusive; no language in the statute precludes a missing child from being adjudicated a CHINS under § 31-34-1-1, and Mother has cited to no authority indicating otherwise. In fact, as the trial court noted, J.W.'s running away only "reinforces that this young man is in need of assistance." (App. Vol. 2 at 105).

[18] To the extent that Mother argues that "this CHINS matter should be dismissed, with or without prejudice," as "neither [she] nor [DCS] can comply with the CHINS adjudication . . . because J.W. is unavailable to receive [services]," we likewise find that argument unavailing. (Mother's Br. 21, 25). Mother apparently misapprehends her obligations under the Participation Order. The Participation Order requires Mother to engage in home-based therapy, complete a parenting assessment, and participate in family therapy with J.W. "when appropriate," and the trial court expressly acknowledged that family therapy can only begin once J.W. has been located. (*See* App. Vol. 2 at 105 ("While DCS is unable to provide the needed services until [J.W.] is located, the Court is unwilling to find that [J.W.] is not in need of services based on this fact alone.")). J.W.'s absence does not preclude Mother from following the trial court's orders to engage in home-based therapy, complete the parenting assessment, and otherwise ready herself for J.W.'s return, at which time family therapy can begin. Certainly, if Mother's goal is to reunify with J.W. as soon as possible, she should not delay participating in services until after J.W. is located.

We reverse a trial court's CHINS adjudication only when clearly erroneous, *i.e.*, "that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

Affirmed.

Najam, J., and Crone, J., concur.